The LEGISLATIVE RESEARCH COMMISSION, By and Through Joseph W. PRATHER, Senator, and Bobby H. Richardson, Representative, Kentucky General Assembly, Individually and as Co-Chairmen of the Legislative Research Commission, Appellants,

v.

John Y. BROWN, Jr., Governor, Commonwealth of Kentucky, and Steven L. Beshear, Attorney General, Commonwealth of Kentucky, Appellees.

Supreme Court of Kentucky.

Jan. 19, 1984.

As Modified on Denial of Rehearing March 1, 1984.

Gross C. Lindsay, Henderson, Kathleen L. Patterson, Frankfort, for appellants.

Bert T. Combs, Wyatt, Tarrant & Combs, Sheryl G. Snyder, Wyatt, Tarrant & Combs, Louisville, Edward F. Prichard, Jr., Prichard & Stallard, Rush Dozier, Jr., General Counsel, Robert L. Chenoweth, Asst. Deputy Atty. Gen., Frankfort, for appellees.

Jane V. Fitzpatrick, Brooks, Coffman & Fitzpatrick, Lexington, for amicus curiae, Kentucky Educ. Ass'n; John J. Slattery, Jr., General Counsel, Kentucky Educ. Ass'n, Louisville, of counsel.

STEPHENS, Chief Justice.

On this appeal, we address the constitutionality of several acts of the Kentucky General Assembly passed by that body's 1982 regular session. This case has been trumpeted abroad as a test of the relative constitutional powers of the Governor of the Commonwealth as opposed to those of the General Assembly and has further been described as a power struggle between these two particular branches of our state government.

It is more accurately a case which deals with legislative enactments that confer certain powers on the Legislative Research Commission,[1] most of which are designed to be exercised by that body when the General Assembly is adjourned. The basic legal issues involved deal with the delegation of powers by the General Assembly to the LRC and the application of the historical doctrine of the separation of powers to the particular statutes in question. An answer to the questions posed by this litigation necessarily requires consideration of the nature and limitations of the LRC.

## I. PROCEDURAL HISTORY

The LRC, acting by and through appellants Prather, President Pro Tem of the Senate, and Richardson, Speaker of the House of Representatives, Co-Chairmen of the LRC, filed this action in Franklin Circuit Court. The complaint sought a declaration of rights as to the validity of several statutes, following a challenge thereto by the Governor. The appellees, by counterclaim, impleaded certain additional statutes[2] in order to insure that all issues were litigated. Following an evidentiary hearing, the trial court rendered a written opinion and a judgment.

Based on agreements and stipulations of the parties, not all of the statutes in question were submitted to the trial court for judgment, and we will not, perforce, decide those issues. The general subject matters of the controverted statutes are as follows:

---

**1.** For brevity, we will hereinafter describe the Legislative Research Commission as "LRC".

**2.** The statutes, grouped by subject matter, will be discussed in detail at a later point in this opinion.

the power of the LRC to act in the stead of the General Assembly while it is adjourned; the power of the Speaker of the House and the President Pro Tem of the Senate to make appointments to and to serve as members of certain boards and commissions; the power of the LRC to determine or to approve budget reductions when the General Assembly is adjourned; the power of the LRC to approve the action of the executive in applying for so-called Federal "Block Grants;" the power of the LRC to grant or withhold legal effect from any executive order promulgated by the Governor which reorganizes the administrative structure of the executive branch of government; and the power of the LRC to delay the legal effect of administrative regulations adopted by the Governor.

## II.  JUDGMENT OF THE TRIAL COURT

The trial court ruled that each and every questioned statute was constitutionally defective; in effect, ruling in favor of the appellees.

In summary, the court declared that the powers of the LRC were limited to "oversight" and that a statutory attempt to authorize the LRC to conduct the business of the General Assembly was a violation of Kentucky's separation of powers doctrine. The right of the appellants to make certain appointments to boards and commissions was declared invalid for the reason that the power of appointment was an executive function. The right of the LRC to veto executive decisions concerning the administration of the budget was held to be executive in nature and not the subject of proper delegation by the General Assembly. The legislative power of the LRC to approve an executive request for a Federal Block Grant was held to be void because such action constitutes "lawmaking after adjournment of the full General Assembly." The power of the LRC to, in effect, veto a Governor's reorganization plan was similarly held invalid as being the unconstitutional exercise of lawmaking authority following the adjournment of the General Assembly. Final-

ly, the power given to the LRC to delay the effect of executive administrative regulations was declared to be a violation of the separation of powers doctrine.

Subsequent to the entry of the above judgment and following an appropriate motion, this Court, for obvious reasons, transferred this case from the trial court. CR 76.18.

## III.  CONTENTIONS OF THE PARTIES

In essence, the appellants, representing the LRC, argue that the LRC is a "legitimate arm" of the General Assembly, and that it may carry out any and all necessary functions of the General Assembly, following the adjournment of the General Assembly. In furtherance of this argument Appellants claim that even though some of the authority given to the LRC under the questioned statutes may be technically executive in nature, such incursion by the legislative branch into the powers of the executive is constitutionally permissible under a so-called "liberal" construction of the Kentucky constitutional provisions creating the separation of powers doctrine.

Predictably, appellees urge that the powers given to the LRC by the statutes constitute far more than mere "oversight" and actually constitute the power to *legislate.* Moreover, appellees argue that this Court has consistently ruled that the doctrine of the separation of powers in this Commonwealth must be strictly construed and that all such incursions by one branch of government into the sphere of influence of another branch are constitutionally prohibited.

## IV.  A HISTORY OF THE LRC

Because the statutes in question grant the LRC much power, authority and responsibility, it will be helpful to discuss the nature of this organization, and to identify its role in the constitutional scheme of the organization of state government.

The parent of the present LRC, The Legislative Council, was given birth by the 1936 session of the General Assembly.[3]  It was

---

**3.** §§ 4618–138 through 4618–142, Carroll's  Kentucky Code (1936).

composed of fifteen members: five Senators appointed by the Lieutenant Governor, five Representatives appointed by the Speaker of the House, and five state officials appointed by the Governor. It was empowered solely to engage in fact-finding. In 1944, the Legislative Council's membership was enlarged to sixteen members, none of whom were appointed by the Governor.[4] The eight Senators and eight Representatives serving were appointed by the Lieutenant Governor and the Speaker of the House, respectively. The Council's powers were expanded to include organizational functions prior to each regular session of the General Assembly. In 1948, the Council was renamed the Legislative Research Commission, and its membership was reduced to seven: the Governor as Chairman, the President Pro Tem of the Senate, the Speaker of the House, and the majority and minority floor leaders of the Senate and the House.[5] Its powers were essentially unchanged. Subsequently, the Lieutenant Governor replaced the Governor as Chairman.[6] In 1974, the Lieutenant Governor was removed as a member and under the present statute all members of the LRC are members of the legislative branch of government.[7]

It is patently clear that the LRC as it currently exists, and as it has existed since 1974, is as appellants concede, an "arm" of the General Assembly. It is beyond cavil that the primary role, if not the exclusive role, of the LRC has been historically that of a research, fact-finding, secretariat and general support agency for the General Assembly. Since the LRC's membership consists of a small percentage of the total membership of the two houses of the General Assembly, no one could argue that it has any powers not given to it by its parent, the General Assembly, and no one could argue that it can legislate. The legislative power lies solely within the province of the General Assembly *and its entire, publicly elected membership.* Our constitution makes that clear. Ky. Const. Sec. 29 states, "[T]he legislative power shall be vested in a House of Representatives and a Senate, which, together shall be styled the 'General Assembly of the Commonwealth of Kentucky'." Whatever else the LRC may constitutionally do, it may not legislate.[8]

## V. THE SEPARATION OF POWERS DOCTRINE

President George Washington, in his farewell address, described the problem which is addressed by the separation of powers doctrine when he said:

The spirit of encroachment [of one branch of government into the functions of another] tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism. XIII, *Writings of George Washington,* 277, 306 (Ford ed., N.Y., 1892).

Montesquieu, the father of the doctrine of separation of powers, articulated the concept by writing:

Here then is the fundamental constitution of the government we are treating of. The legislative body being composed of two parts, they check one another by the mutual privilege of rejecting. They are both restrained by the executive power, as the executive is by the legislative. 1 Montesquieu, *The Spirit of Laws,* Book XI, Chapter VI, 159 (1823).

The extent to which a country can successfully resolve the conflict among the three branches of government is, to a very great extent, the measure of that nation's capacity to self-govern.

The framers of Kentucky's four constitutions obviously were cognizant of the need for the separation of powers. Unlike the federal constitution, the framers of Kentucky's constitution included an express

---

4. 1944 Kentucky Acts, Chapter 149.

5. 1948 Kentucky Acts, Chapter 15.

6. 1956 Acts, First Extraordinary Session, Ch. 7, Art. XII, § 1.

7. 1974 Kentucky Acts, Chapter 353.

8. For an extensive discussion of the governmental scheme set up by the framers of the Constitution see *Brown v. Barkley,* Ky., 628 S.W.2d 616 (1982).

separation of powers provision. They were undoubtedly familiar with the potential damage to the interests of the citizenry if the powers of government were usurped by one or more branches of that government. Our present constitution contains explicit provisions which, on the one hand, *mandate* separation among the three branches of government, and on the other hand, specifically *prohibit* incursion of one branch of government into the powers and functions of the others. Thus, our constitution has a double-barreled, positive-negative approach:

> Section 27  *The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy,* to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.
>
> (Emphasis added.)
>
> Section 28  No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

Subsequent provisions of the Constitution proceed logically and consistently with the policy established in Sections 27 and 28 that grant powers to the three branches of government. Section 29 vests the legislative power in the General Assembly, Section 69 vests the executive power in the Governor and finally, Section 109, as amended by the people in 1975, establishes the judicial power in the Court of Justice.[9]

A motivating factor that led to the drafting and eventual adoption of our present constitution was a strong desire on the part of the people to curb the power of the General Assembly. Convention delegate John D. Carroll from Henry County exemplified that spirit when he stated,

> "It is a well known fact that one of the prime causes for the calling of this convention was the abuses practiced by the legislative department of this state...."
> 1 Debates of Constitutional Convention of 1890, p. 1482.

According to delegate J.F. Askew, there was a great necessity to "reform the legislative department...." *Id.* at 3821. A noted Kentucky constitutional historian, Dr. Robert Ireland, clearly established in his testimony before the trial court that the desire to curb the power of the General Assembly was the primary motivation for calling the 1891 Constitutional Convention.

Even a cursory reading of Kentucky history reveals the factual basis for the conclusions of delegates Carroll and Askew and the opinion of Dr. Ireland. The then General Assembly was dominated by a few, powerful special interests who wielded that power for their own benefit. This situation obviously does not exist today; however, constitutions are operative until and unless changed by the people.

A case which was contemporaneously decided with the adoption of our present constitution, *Pratt v. Breckinridge,* 23 Ky.Law Rep. 1858, 112 Ky. 1, 65 S.W. 136 (1901) stated:

> From this it seems clear that the makers of the constitution intended the legislature to discuss and enact laws, and *to do nothing else.* 65 S.W. at 140. (Emphasis added.)

Moreover, it has been our view, in interpreting Sections 27 and 28, that the separation of powers doctrine is fundamental to Kentucky's tripartite system of government and must be "strictly construed." *Arnett v. Meredith,* Ky., 275 Ky. 223, 121 S.W.2d 36, 38 (1938). In *Sibert v. Garrett,* 197 Ky. 17, 246 S.W. 455 (1922), we expounded at some

---

**9.** A reading of these sections of the constitution shows that certain normal functions of one branch were specifically granted to another branch, e.g. the veto power of the Governor over Acts of the General Assembly, Ky. Const. Sec. 88 and 89, the power of the General Assembly to remove its own member, Ky. Const. Sec. 39.

length on the history and the purposes of Sections 27 and 28:

> "Perhaps no state forming a part of the national government of the United States has a Constitution whose language more emphatically separates and perpetuates what might be termed the American tripod form of government than does our Constitution, which history tells us came from the pen of the great declaimer of American independence, Thomas Jefferson.... 246 S.W. at 457.
>
> ... *We conceive it to be the duty of the courts to adopt the construction most conducive ... [to prevent] ... the destruction of the edifice as contemplated.*" 246 S.W. at 458. (Emphasis added.)

Appellants urge this court to adopt a so-called liberal construction of the separation of powers doctrine and argue that the General Assembly is the "dominant" branch of government. In support of this argument, they claim that in *Brown v. Barkley,* Ky., 628 S.W.2d 616 (1982), we denigrated the power of the Governor and gave the General Assembly a dominant role in the tripod, by allegedly giving to the General Assembly all "residual" powers. We do not agree and we do not so interpret *Barkley.*

In *Barkley,* following a lengthy discussion of the inherent or implied powers of the Governor, we said:

> The extent that the Governor has any implied or inherent powers in addition to those the Constitution expressly gives him, it seems clear that such unexpressed executive power is subservient to the overriding authority of the legislature.... 628 S.W.2d at 621.
>
> Practically speaking, except for those conferred upon him specifically by the Constitution, his powers like those of the executive officers created by Const. Sec. 91, are only what the General Assembly chooses to give him. 628 S.W.2d at 623.

These words, plus the following, are seized upon by appellants in their argument as proof that somehow, this Court has sawed off one of the legs of the tripod, viz., that of the executive, and that we have made that branch of government less than equal to the other two branches. Appellants remind us that we also said in *Barkley:*

> It is axiomatic that under our Constitution *the General Assembly has all powers not denied to it or vested elsewhere by the Constitution.* (Emphasis added.)

and:

> Whereas the judicial branch must be and is largely independent of intrusion by the legislative branch, the executive branch exists principally to do its [the legislature's] bidding. 628 S.W.2d at 623.

The inference appellants draw from this language is that the General Assembly possesses all powers and authority to act which are not specifically denied it by the Constitution and has the authority to act in exercising those powers. It is argued that *all powers,* residual in nature, belong to the legislative branch. We do not agree.

■ To place this interpretation on that language would be tantamount to saying that we were repealing Sections 27 and 28 of the Kentucky Constitution. We would in effect be eliminating the separation of powers doctrine. We would reach a result which would fly in the face of history and the legal precedents of this Commonwealth. Our review of that doctrine's history and our description of its language most assuredly confirm this. Nothing in *Barkley* can be construed to deny the existence of the doctrine of separation of powers and the equality of the three coparceners in government. Implicit in *Barkley* is that the General Assembly as the legislative branch, has all powers *which are solely and exclusively legislative in nature.* To argue that any other power is given to the General Assembly simply won't wash. The power referred to in *Barkley* is *legislative power and legislative power only.* In summation, our view is best expressed in *Sibert v. Garrett,* 197 Ky. 17, 246 S.W. 455 (1922), which we reaffirm. There we stated:

> But a deeper probing into and investigation of the subject will reveal the truth

that the rule so generally stated means, not that the Legislature has "all powers" not withheld by the Constitution, but that it "may pass any acts that are not expressly or by necessary implication inhibited by their own Constitutions or by the Federal Constitution." *In other words, the Legislature may perform all legislative acts not expressly or by necessary implication withheld from it, but it may not perform or undertake to perform executive or judicial acts,* except in such instances as may be expressly or by necessary implication directed or permitted by the constitution of the particular state. *To adopt the latitudinous construction that the Legislature may do anything not expressly or impliedly prohibited by the Constitution would, to our minds, at once destroy the separation of the powers of government into the three great departments.* 246 S.W. at 457 (Emphasis added.)

Nearly every one of our sister state courts have similarly resisted any weakening of the doctrine of the separation of powers. See, e.g., *In re Opinion of the Justices,* N.C.App., 295 S.E.2d 589 (1982), and *State ex rel. McLeod v. McInnis,* 278 S.C. 307, 295 S.E.2d 633 (1982). In like manner, the United States Supreme Court, in striking down a federal statute, has spoken to the issue. The Court ruled that an attempt by Congress to vest veto authority in itself over executive action violated the separation of powers doctrine of the United States Constitution. *Immigration and Naturalization Service v. Chadha, Et al.,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). There the court said:

"The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." 103 S.Ct. at 2784.

We should not abandon the philosophical principles that were incorporated by the framers of our present constitution. The purpose of the separation of powers doctrine is uncontroverted. The precedents established by this court have been uniform in retaining the goals set out by the framers. The separation of powers doctrine is set in the concrete of history and legal precedent. We will not overrule those cases and we will not, by the fiat of judicial legislation, change the clear and imperative meaning of our constitution. Such action is within the sole province of the voters of this Commonwealth.

■ We conclude that any statute subject to the scrutiny of Sections 27–28 of the Kentucky Constitution should be judged by a strict construction of those time-tested provisions.

## VI. POST–ADJOURNMENT POWERS OF THE GENERAL ASSEMBLY AND THE LRC

Two major legal questions dominate this area: (1) can the General Assembly delegate its authority to legislate to the LRC and (2) can the General Assembly legislate through its agent, the LRC, while the General Assembly is in adjournment? The answers to these legal questions are inextricably intertwined and relate to the nature and role of the LRC.

We premise this discussion on our previous conclusion that the LRC is part and parcel of the General Assembly and is under its control. It must also be remembered that the LRC is a service agency of the General Assembly. Its functions are limited. Its nature, role and authority do not change our form of government from a tripod into a quadrapod.

(1) Can the General Assembly Delegate its Authority to Legislate to the LRC?

Ky. Const. Sec. 29 reads:

"The legislative power shall be vested in a House of Representatives and a Senate, which, together, shall be styled the 'General Assembly of the Commonwealth of Kentucky.' "

Ky. Const. Sec. 60 provides: "No law ... shall be enacted to take effect upon the approval of any other authority than the

general assembly." While this is not a precise, written constitutional prohibition preventing the General Assembly from delegating its legislative powers to another entity, we have spoken many times on the subject. In *Bloemer v. Turner,* Ky., 281 Ky. 832, 137 S.W.2d 387, 390 (1940), we declared that the Kentucky Constitution "... made sure that the legislature may not in any degree abdicate its power." Further firming up its position, the Court in *Bloemer* said: *It is an accepted principle that "the legislative department has no right to deputize to others the power to perform its governing functions."* 137 S.W.2d at 391. (Emphasis added.) Recognizing there are practical limitations to the hard and fast rule announced, particularly when it involves the implementation of legislative will, we stated:

> But, obviously the legislature cannot deal with subordinate rules or cover the details of administration and execution in its regulatory enactments. Perforce, these must be left to those upon whom the duty of carrying out the legislative will devolves. However, the legislature must lay down policies and establish standards. *Ibid.*

■ Under *Bloemer,* the General Assembly cannot delegate its *power to make a law.* It can, however, establish standards for administration and delegate authority to implement a law. As in so many instances, the principle is easy to state. Its application is difficult.[10]

■ The practical modification or exception developed in *Bloemer* was further explained and expanded in *Commonwealth v. Associated Industries of Kentucky,* Ky., 370 S.W.2d 584 (1963). The rule of that case is that Ky. Const. Sec. 29 does not absolutely prohibit the General Assembly's delegation of legislative power.

A more recent statement of the applicable principles is found in *Holsclaw v. Stephens,* Ky., 507 S.W.2d 462 (1974). In that case we stated:

... when we say that the legislature may not delegate its powers, we mean that *it may not delegate the exercise of its discretion as to what the law shall be, but not that it may not confer discretion in the administration of the law itself...* Generally speaking *a delegation of discretion* is not unlawful if sufficient standards controlling the exercise of that discretion are found in the act ... such as procedural safeguards *and* the right of the delegating authority to withdraw the delegation. 507 S.W.2d at 471. (Emphasis added.)

■ It is clear from the aforementioned cases that delegation, of legislative power, to be lawful, must not include the exercise of discretion as to what the law shall be. In addition, such delegation must have standards controlling the exercise of administrative discretion. Finally, the delegating authority must have the right to withdraw the delegation.

■ Therefore, we conclude that the General Assembly, which constitutionally holds legislative power, cannot delegate that power to the LRC.

(2) While in Adjournment Can the General Assembly Legislate Through its Agent, the LRC?

We begin by reiterating that under Ky. Const. Sec. 29 the General Assembly is the sole legislative branch of government and that its powers, procedures and limitations are set forth in Sections 29 through 68 of that Constitution.

■ The Kentucky General Assembly is not one of continuous session and a necessary corollary thereto is that it cannot legislate after it has adjourned *sine die.* A legislative body ceases to exist at the moment of its adjournment. *Anderson v. Dunn,* 19 U.S. (6 Wheaton) 204, 5 L.Ed. 242 (1821).

As we have concluded above, the General Assembly may not delegate its authority to

---

**10.** The basic rule prohibiting delegation was forcefully reiterated in *Dawson v. Hamilton,* Ky., 314 S.W.2d 532 (1958).

legislate. It follows, therefore, that given the inability to delegate said authority, the General Assembly may not bestow upon its agent, the LRC, nor can the LRC seize for itself, the power to legislate.[11]

With the preceding background we move on to analyze the challenged statutes. In each instance, one or more legal questions have been raised. We shall apply the law stated above, to each statute and determine its validity. Since certain additional legal issues have been raised, we shall discuss those where appropriate.

## VII. POWERS OF THE LRC

KRS 7.090 (1982) created, or more properly re-created, the LRC. In addition, the statute established the LRC's membership, meetings, compensation, direction, personnel and management. Section (1) provides that the LRC is, "... an *independent agency of state government* ... which is exempt from control by the executive branch and from reorganization by the governor." (Emphasis added.)

KRS 7.100 (1982) sets out all the duties and authority of the LRC. Basically, the statute provides that the agency has those duties that involve fact-finding, investigation, information gathering, record-keeping, publishing, research and education. It is a service organization of the General Assembly. However, Section (8) of KRS 7.100 authorizes the LRC to:

Conduct, while the general assembly is not in session, any and all business of the legislative department of government, except for the passage of legislation, which could be conducted by the legislative department of government or the general assembly if the general assembly was in session. (Emphasis added.)

11. See, *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 295 S.E.2d 633 (1982); *In re Opinion of the Justices*, 305 N.C. 767, 295 S.E.2d 589 (1982); *General Assembly v. Byrne*, 90 N.J. 376, 448 A.2d 438 (1982); *State ex rel. Judge v. Legislative Finance Committee*, 168 Mont. 470, 543 P.2d 1317 (1975); *Jewett v. Williams*, 84 Idaho 93, 369 P.2d 590 (1962); *State ex rel. Jones v. Atterbury*, 300 S.W.2d

The trial court struck down KRS 7.090(1) which made the LRC an "independent" agency of state government. It declared that under Ky. Const. Secs. 27–28, there are *three* branches of government and that the net effect of the words "independent agency of state government" was to create a fourth branch of government. Moreover, the trial court ruled that the provisions of KRS 7.100(8), that broadened the authority of the LRC, when the General Assembly was in adjournment to include "... any and all business of the legislative department of government, except for the passage of legislation ..." were constitutionally invalid. The trial judge declared that the LRC could not, because of the separation of powers doctrine, exercise any supervision over the executive branch and that for the same reason, the LRC could not exercise any authority over the judiciary. The trial court obviously felt that both violations were possible under the broad grant of powers in the questioned statutes. The trial court also declared that the provisions brought new life to the General Assembly following its adjournment and thus were violative of Ky. Const. Sec. 42.

We agree with the trial court and affirm those portions of its judgment holding KRS 7.090(1) and KRS 7.100(8) unconstitutional.

As we have said, it is clear that the LRC is totally an agent of the General Assembly and may aid and assist that branch of government. As we also have said, the LRC cannot do anything the General Assembly cannot do.

■ KRS 7.090(1) declares that the LRC is an "independent" agency of state government. This does not comport with our previous analysis of the nature of the LRC, nor

806 (Mo.1957); *State ex rel. Robinson v. Fluent*, 30 Wash.2d 194, 191 P.2d 241 (1948), cert. denied sub nom. *Washington Pension Union v. Washington*, 335 U.S. 844, 69 S.Ct. 66, 93 L.Ed. 394 (1948); *State ex rel. Hamblen v. Yelle*, 29 Wash.2d 68, 185 P.2d 723 (1947); *In re Opinion of the Justices*, 248 Ala. 590, 29 So.2d 10 (1947).

does it comport with our constitution which recognizes only three branches of government.

There is, simply put, no fourth branch of government. The LRC was created by, is controlled by, and is a service type agency of the General Assembly. It is independent of the Governor; it is not subject to reorganization by the Governor, it is subject to the control of its creator, the General Assembly. It is an "oversight" and service organization for and on behalf of the General Assembly. As such, it is a part, albeit an important part, of the General Assembly, the legislative branch of government. It is part of the General Assembly by reason of its statutory birth and its statutory nourishing. We therefore, conclude that KRS 7.090(1), which declares the LRC to be an independent agency of state government is constitutionally invalid.

■ KRS 7.100(8) attempts to grant all authority constitutional and otherwise, express and inherent, save only the power to pass legislation to the General Assembly's agent, the LRC. Such a grant of power includes, but is not limited to the power to confirm executive appointments, the power to reject or modify administrative regulations, and the power to generally exercise supervision over the executive and judicial branches of government. The testimony of a witness for the appellants at trial conceded the potential of such act by saying:

> [I] would say that the Legislature has all functions that are not specifically granted to the Governor or that are not specifically granted to the Judicial Branch. All other powers are inherent in the Legislature whether you term them legislative functions *or whatever, they're still in the Legislature.*

Moreover, the same witness stated that while the General Assembly can "delegate" by statute certain powers to the Governor, it can "rightfully put any strings that it wants to on that delegation of power" and that the LRC can, in effect, act for the General Assembly in "putting the strings on." The witness also described it another way when he said that the LRC could be used to "limit" the power given to the Governor, and that the LRC has "review" authority. He concluded that the LRC could "[d]o *anything short of performing legislative acts . . ."*

Such a grant of power clearly is impermissible under Ky. Const. Secs. 27–28. It also violates Ky. Const. Sec. 42, in that such a provision brings new life to the General Assembly (through the LRC) following adjournment.

## VIII. LRC REVIEW OF ADMINISTRATIVE REGULATIONS

The General Assembly has in its recent history exercised "oversight" and review of administrative regulations promulgated by the various executive agencies, boards and commissions. KRS 13.080–13.125. This "oversight" and review has been achieved through a subcommittee of the LRC known as the Administrative Regulation Review Subcommittee. KRS 13.087. The effect of this LRC subcommittee's actions was *recommendatory* in nature. KRS 13.087.

However, the 1982 General Assembly made several major changes in the nature of this subcommittee's actions which are the subject of this law suit. KRS 13.085(1)(d) and (e) (effective 7–15–82) provide that no regulation made by any administrative body shall become effective until it has been forwarded to the LRC *and* until it has been *reviewed and accepted* by the LRC, *or* it has been placed before and not disapproved by the General Assembly. KRS 13.-087(4) requires that the LRC shall submit all regulations to one of its subcommittees to determine " . . . *if the regulation conforms to the statutory authority under which it was promulgated and if it carries out the legislative intent of the statutory authority* under which it was promulgated." (Emphasis added.) The subcommittees' findings are reported to the LRC which then either finds that the regulation con-

forms to the legislative intent of the statutory authority and accepts the regulation, or attaches a notation of its objection to the regulation and returns it to the promulgating administrative body. KRS 13.087(5) provides that the administrative body may then revise the regulation so as to make it comply with the LRC's determination of the legislative intent or that body may return it unchanged to the LRC. KRS 13.087(6) provides that if the General Assembly is in session when an administrative body returns a regulation, that is objected to by the LRC, then the regulation shall be put before the General Assembly. KRS 13.-087(7) requires a monthly reporting to the LRC of all subcommittee actions regarding administrative regulations. KRS 13.087(8) requires that all regulations not accepted by the LRC *or* one of its subcommittees shall be placed before the General Assembly. KRS 13.087(9) provides that the *General Assembly* may, during its regular sessions, and by joint resolution, or bill, require regulations submitted to the LRC to be laid before the General Assembly and may void any regulation already in effect. KRS 13.-088(1) provides a procedure for the Governor to issue an executive order, in the event of an emergency, to permit applicable regulations to become effective immediately, provided that the emergency regulations are submitted to the LRC for review. KRS 13.088(2) provides that an emergency regulation shall expire when final review action is taken as provided by KRS 13.080 and 13.085. KRS 13.088(3) provides that when the LRC or a subcommittee thereof has an objection to a regulation, such regulation cannot be filed as an emergency regulation. KRS 13.092(1) provides that when the General Assembly is not in session, no administrative regulation, excepting an emergency regulation, shall become effective until accepted by the LRC. KRS 13.092(2) provides that until an administrative regulation is accepted by the LRC, it shall be of no force or effect. KRS 13.092(3) states that if any of the provisions of KRS 13.092 are held to

be unconstitutional, no administrative body shall have authority to promulgate any regulations, notwithstanding any other provision of the law.

It is clear that if the LRC subcommittee or the LRC itself disapproved of a proposed regulation, the regulation's implementation would be delayed until the next session of the General Assembly. Therefore, KRS 13.-085 and KRS 13.087 provide a device whereby the LRC or a subcommittee thereof could block, for a period of nearly twenty-one months, the administrative policy of the executive branch of government. KRS 13.-085 and KRS 13.087 have the effect of creating a legislative veto of the administrative policy of the executive branch of government. One of appellants' witnesses testified to this effect when he said:

Q. 43. Well, in practical effect it is a legislative veto?

A. *It's a legislative veto;* right.

Q. 44. It's a legislative veto...

A. Yes, sir.

Q. 45. ... of proposed regulations by departments of government?

A. Yes, sir.

Under pre-existing law, LRC objections to prepared regulations were precatory. The objections did not have the force of law. The changes in KRS 13.085, 13.087 and 13.-092 which require LRC approval or LRC subcommittee approval of regulations have the effect of preventing the executive from dealing with emergencies. The power to suspend a regulation's effective date for up to twenty-one months is the power to effectively prevent a regulation from having the force of law. In addition, the legislature has statutorily attempted to deliver this power into the hands of seven members of the General Assembly or into the control of a subcommittee thereof.[12]

The trial court held that such constituted a violation of the separation of powers doctrine. The judgment stated that delegation of legislative powers to the LRC when the

---

**12.** In essence, as we have said, a "quadrapod",     instead of a tripod.

General Assembly was in adjournment was improper and declared that neither the General Assembly nor its designee could *legislate* when the General Assembly was not in session.

The adoption of administrative regulations necessary to implement and carry out the purpose of legislative enactments is executive in nature and is ordinarily within the constitutional purview of the executive branch of government. Ky. Const. Secs. 27–28, 42, 88 and 89. *Brown v. Barkley,* Ky., 628 S.W.2d 616 (1982). We conclude that KRS 13.085(1)(d) and (e); KRS 13.087(4), (5), (6), (7), (8), (9); KRS 13.088(2)(3); and KRS 13.092(1) and (2) which set out the plan and the rules for providing legislative or LRC review of proposed regulations as those statutes are presently written are violative of Ky. Const. Secs. 27–28 and are a legislative encroachment into the power of the executive branch.[13]

It will also be recalled that the review of the regulations was for the stated legislative purpose of determining if they comported with statutory authority and if they carried out the legislative intent. It requires no citation of authority to state unequivocally that such a determination is a judicial matter and is within the purview of the judiciary, the Court of Justice.[14] For this reason, we also conclude that the statutory scheme discussed above violates the separation of powers doctrine. *See, Butler v. United Cerebral Palsy of Northern Kentucky, Inc.,* Ky., 352 S.W.2d 203 (1961).

One further question remains. Appellants argue that KRS 13.092(3), a non-severability clause, is applicable. The statute, in essence, provides that if the LRC or its subcommittee cannot constitutionally veto proposed regulations, then the executive department cannot issue any more regulations.

The trial court declared KRS 13.092(3) to be void as being in contravention of the Governor's constitutional duty to faithfully execute the laws of the Commonwealth under Sections 69 and 81 of the Kentucky Constitution.

Under Kentucky's Constitution, the executive powers and responsibilities of the Commonwealth lie within the province of the Governor. Ky. Const. Sec. 69. Under Section 81 the Governor has the positive duty to go forward and "take care that the laws be faithfully executed". Ky. Const. Sec. 81. In *Brown v. Barkley,* Ky., 628 S.W.2d 616 (1982), we reaffirmed this executive duty when we said:

> We do not doubt that if the General Assembly should pass a law that requires implementation, and appropriate funds for that purpose but omit specifying the manner in which it is to be carried out, *the chief executive would be required to carry it out and have the right to choose the means by which to do it.* 628 S.W.2d at 623. (Emphasis added.)

This right, this duty, exists because of the specific constitutional duties conferred on the Governor.

The non-severability clause that appears in KRS 13.092(3) has the effect of throwing the baby out with the bath water. The adoption and use of administrative regulations are important tools in the operation of modern government, at all levels. The purpose is to enable the Governor to successfully carry out the constitutionally mandated executive and administrative duties bestowed upon that office: *General Assembly v. Byrne,* 90 N.J. 376, 448 A.2d 438 (1982); *Burton v. Mayer,* 274 Ky. 245, 118 S.W.2d 161 (1938). There is no constitutional au-

---

**13.** Under *Chadha, supra,* we conclude that the legislative veto of the action of the executive is also a violation of the separation of powers.

**14.** This is not to say that any person, or organization including the LRC, does not have the unrestricted right to form an opinion as to whether a proposed action is legal or not. What we do say is that the determination of such as far as it causes the veto of executive action, is invalid.

thority, however, whereby the governor can add, directly or indirectly, to the content of a statute by means of an administrative regulation and, a fortiori, no administrative regulation can be adopted unless it is necessary and is related to the content of the legislative act and to its effective administration.

The statute in question not only impliedly reorganizes the executive duties of the Governor, but also attempts to usurp these powers. Having failed at the first part, it further attempts to restrict the ability of the Governor to carry out his sworn duties. The General Assembly, by enacting the clause, has restricted the power of the Governor to carry out his duties. In *Kenton Water Company v. City of Covington,* 156 Ky. 569, 161 S.W. 988 (1913), we said:

> [W]here the Constitution has by express provision denied the Legislature the right to require a particular thing to be done, or to legislate upon a particular subject or in a particular way, then the Legislature cannot by indirection require it to be done by attaching it as a condition to the exercise of some power which it has granted and which is essential to the public welfare that it be exercised. To do this would be to permit the constitutional provision to be indirectly violated and render it a nullity.... 161 S.W. at 992.

The restriction placed on the executive by KRS 13.092(3) effectively and unconstitutionally limits and interferes with the governor's mandated duties. It should also be noted that the General Assembly, through its enactment of KRS 446.090 clearly established the necessity of being able to sever a constitutionally infirm section of any statute from the sound portion thereof.

We, therefore, conclude that Section 3 of KRS 13.092 is void and we affirm the trial court.

## IX. DOES THE GENERAL ASSEMBLY HAVE THE POWER TO PRESCRIBE THE METHODS AND APPOINTING AUTHORITY FOR INFERIOR STATE OFFICES?

The next group of controverted statutes deals with the subject of appointments to various boards and commissions. For purposes of clarity and brevity, we divide these 1982 statutes into five categories.

The first category empowers the Speaker of the House of Representatives and the President Pro Tem of the Senate to appoint one or more members of particular boards.[15] In the second category the Speaker of the House of Representatives and the President Pro Tem of the Senate are made ex officio members of certain existing boards and commissions.[16] The third category is that which confers on the LRC or a joint interim legislative committee the power to advise and consent to the Governor's appointments to boards or commissions.[17] Category four directs the Governor to make appointments solely from a list submitted to him by the LRC.[18] The fifth and final category permits the LRC or its chairmen to make appointments to certain boards and commissions.[19]

The trial court struck down the provisions in the first and fifth categories, ruling that

---

**15.** KRS 230.220(1), Kentucky State Racing Commission; KRS 31.015(1)(b)–(c), Public Advocacy Commission; KRS 230.620, Kentucky Harness Commission; KRS 42.500, State Investment Commission; KRS 247.090(1)(f), State Fair Board; KRS 117.015(2), State Board of Elections; KRS 163.505, Commission on Deaf and Hearing Impaired; KRS 174.105(2), Motor Carrier Board; and KRS 164.010, Council on Higher Education; KRS 103.2101(1)(a)–(b), Industrial Revenue Bond Oversight Committee.

**16.** KRS 154.675(1), Enterprise Zone Authority.

**17.** KRS 278.050(1), Enterprise Zone Authority; and KRS 248.510(1)(b).

**18.** KRS 151.560(1)(a), Flood Control Advisory Commission, and KRS 18A.050(2), State Personnel Board.

**19.** KRS 153.380(3), Kentucky Oral History Commission; KRS 441.615(1)(g), Kentucky Local Correctional Facilities Construction Authority; KRS 151.560(1)(b), Flood Control Advisory Commission.

the power to appoint members of boards and agencies within the executive department of government is an essentially executive power which cannot be exercised by any member of the legislative department, including the Speaker of the House of Representatives and President Pro Tempore of the Senate. It declared that the second grouping of statutes permitting members of the legislature to sit as members of boards or agencies within the executive department was violative of Ky. Const. Sec. 28. Moreover, the trial court ruled that the statutes in the third category in which the General Assembly purported to grant the LRC the power to advise and consent to the Governor's appointments were improper delegations of power by the General Assembly. The trial court also declared the provisions in the fourth grouping requiring that the Governor make appointments to boards from lists of persons nominated by the LRC, to be an improper legislative designation of the appointee.

After limiting the eligibility requirements for re-election to certain statewide offices and after declaring that office holders' duties shall be provided by law, Ky. Const. Sec. 93:

> Inferior State officers, not specifically provided for in this Constitution, may *be appointed or elected, in such manner as may be prescribed by law,* for a term not exceeding four years, and until their successors are appointed or elected and qualified. (Emphasis added.)

From a reading of this section, it is evident that the General Assembly may, by law, *create* these various inferior "state officers." It also appears, at first blush, that the General Assembly may provide the manner of appointment or election of these offices. In 1898, close in time to the adoption of the present Constitution, we decided *Commission of Sinking Fund v. George,* 104 Ky. 260, 47 S.W. 779 (1898), the first of many cases addressing the question of which branch of government has the constitutional authority to make appointments.

The court reviewed an act of the General Assembly which created a Board of Penitentiary Commissioners to regulate the penal institutions of the Commonwealth. The act provided that three members of that commission were to be elected by the General Assembly. It was argued that this "election" of the commissioners was an executive function and not a legislative one and that, therefore, the election provision of the act violated the separation of powers doctrine. In rejecting this contention, we declared that there was no express or implied provision in the Kentucky Constitution which conferred the power to appoint such a commission upon the Governor. In upholding the General Assembly's right to "elect" the commissioners, this Court relied heavily on the specific wording in Section 93:

> Under Section 93 of the Constitution, the Legislature could not only provide for inferior state officers, *but could designate how they should be appointed or elected.* 47 S.W. at 781. (Emphasis added.)

The Court specifically rejected the contention that the appointive authority being placed in the General Assembly violated the doctrine of separation of powers:

> The truth is that the power of appointing or electing to office does not necessarily and ordinarily belong to either the legislative, the executive or judicial departments ... It is an executive function when the law has committed it to the executive ... 47 S.W. at 781.

The import of the decision in this case seems to be that the General Assembly has, under the wording of Ky. Const. Sec. 93, very broad powers in establishing boards and commissions and in determining how the membership thereof is chosen, even to the extent of selecting the membership itself.

However, it was not long before this Court, when confronted with the same principle of law, veered sharply away from the holding in *George.* In *Pratt v. Breckinridge,* 23 Ky. Law Rep. 1858, 112 Ky. 1, 65

S.W. 136 (1901), we determined an 1899 election contest for the office of Attorney General. An act of the General Assembly created a three-person state election commission which held the power to resolve election disputes and also had the power to appoint the members of every local election commission in the state. The members of the State Election Commission were to be appointed by the General Assembly.

At the general election of 1899, Breckinridge polled fewer votes than his opponent, Pratt. Breckinridge filed an election contest with the State Election Commission, which declared him the winner, thus overturning the popular vote. Breckinridge filed suit for specific performance of the decision of the Election Commission. On appeal, this Court, in a decision that received much adverse notoriety from both contemporary and subsequent historians, declared that the appointment, by the General Assembly, of members of the Election Commission was violative of the separation of powers doctrine.

Pratt, as appellant, relied on *Commission of Sinking Fund v. George,* 104 Ky. 260, 47 S.W. 779 (1898), and argued that Ky. Const. Sec. 93 meant that the Governor did not have the executive power of appointment and that the General Assembly was constitutionally authorized to exercise the power of appointment. The Court rejected this argument, overruled *George* and held that Section 93 does nothing more than permit the General Assembly to determine whether boards and commissions are to be popularly elected, or appointed. We said:

> The creation of an office is accomplished by the exercise of legislative power. It is done by the enactment of a law. *The filling of it, when not exercised by the people, or in some manner directed or permitted by the constitution, is executive, and must be performed by an execu-*

*tive officer.* 65 S.W. at 137. (Emphasis added.)

Several years later, in a less volatile atmosphere in the Commonwealth than had existed in *Pratt,*[20] this Court made a veer back towards the holding in *George.* In *Sewell v. Bennett,* 187 Ky. 626, 220 S.W. 517 (1920), the General Assembly, in enacting the Workmen's Compensation Act, created a compensation board and provided that the Governor appoint the Board but omitted the requirement of legislative approval of such appointments. A separate, pre-existing statute provided that *all* persons to be appointed by the Governor were subject to the advice and consent of the Senate. We applied the separate statute and held that when the General Assembly created a *legislative board* it could make the appointments itself, it could delegate such power to the Governor or it could delegate it to "any other person or body". The Court, indeed, seemed to retreat from *Pratt* and revitalize *George.*

However, two years later, we decided the landmark case of *Sibert v. Garrett,* 197 Ky. 17, 246 S.W. 455 (1922). As we have previously said,[21] in *Sibert,* this court ruled on the validity of an act which re-created a State Highway Commission of four members and provided that the members should be elected by the General Assembly. In holding that the appointment powers were executive in nature, we explained:

> The appointment of officers is intrinsically an administrative or executive act, but this does not imply that no appointment can be made by any department of government other than the executive, for all the authorities agree that the courts and the legislature may appoint those public officers which are necessary to the exercise of their own function. 246 S.W. at 458.

The Court specifically declined to follow *George,* saying it was "short lived". 246

---

**20.** For those who desire to learn more of the political atmosphere surrounding *Pratt,* See, Chapter 18, *Kentucky Decades of Discord, 1865–1906,* Hambleton Tapp-James C. Klotter, The Kentucky Historical Society.

**21.** See discussion of *Sibert* in Section IV of this opinion, infra.

S.W. at 458. It further chose to follow *Pratt,* even though acknowledging that it was a decision with political overtones and ramifications.

Addressing itself to the language in Ky. Const. Sec. 93, the Court said:

So where the Constitution provides that all officers whose appointment is not otherwise provided for in the Constitution shall be chosen in such manner as may be prescribed by law, it is held that, while this provision authorizes the Legislature to provide by law for the appointment or election of such officers, *it does not authorize the Legislature itself to make such appointment or election.* 246 S.W. at 459. (Emphasis added).

The Court used the separation of powers doctrine to bolster its view when it said:

The logical result of the contention, [that the General Assembly, under Section 93, could make appointments] if adopted and followed, would empower the Legislature to appoint or elect the private secretary to the Governor; the Commissioner, sergeant at arms, tipstaff, and bailiff of the Court of Appeals ....

... [S]uch power on the part of the Legislature, if a full exercise of it should be persisted in, would enable it to gradually absorb to itself the patronage and control of the greater part of the functioning agencies of the state and county governments, and thus endowed it would be little short of a legislative oligarchy. 246 S.W. at 460.

It is our view that *Sibert* has been unchanged and is therefore dispositive of the central issue present in these contested statutes.

Appellants urge that *Craig v. O'Rear,* 199 Ky. 553, 251 S.W. 828 (1923), decided two years after *Sibert,* constituted another veer by the court and is controlling. We do not agree. In that case, the Court ruled that the General Assembly could appoint "temporary" agents to perform a particular task, to serve without term and without pay and whose functions cease when the purpose of such appointment was accomplished.

One other case merits discussion. In *Rouse v. Johnson,* 234 Ky. 473, 28 S.W.2d 745 (1930), a state highway commission was re-created by an act of the General Assembly. The power of appointment to that commission was removed from the Governor and lodged with an "appointing board" which consisted of the Governor, the Lieutenant Governor and the Attorney General. This act was held valid, as being consistent with Ky. Const. Sec. 93 and with Ky. Const. Secs. 27–28.

It was claimed that the conferring of appointive power on the Lieutenant Governor was violative of Ky. Const. Secs. 27 and 28, because that office was said to be primarily a *legislative* one. That being true, it was argued, the delegation of appointive power (executive in nature), violated the separation of powers. We concluded that even though the Lieutenant Governor presides over the Senate and can vote in case of a tie, under our Constitution, the Lieutenant Governor is a member of the executive branch of government. This being true, the contention fell and it was declared that the power of appointment was indeed properly lodged in the commission, a part of the executive branch of government. We will now apply these principles to the contested statutes.

The provisions in category number one, in which the Speaker and the President Pro Tem are authorized to make appointments, fly in the face of the principle which declares such appointments cannot be made by the General Assembly itself. Such statutes constitute an incursion by the General Assembly, or in this case, its designees, into the separation of powers doctrine. The fifth category of statutes, in which the LRC is empowered to make appointments, is invalid for the same reason. The statutes designated as category number four, which direct the Governor to make appointments from lists submitted to him by the LRC, are similarly invalid. The General Assembly

has attempted to do indirectly what it cannot do directly.

The provisions in category number three, which authorize the LRC or an interim legislative committee to advise and consent on certain appointments is invalid.

The statutes contained in category number two, in which the Speaker and the President Pro Tem are made members of certain boards, are also invalid because such constitutes a legislative appointment which infringes on the right of the Governor to make such appointments.

In those statutes where the General Assembly established boards, commissions, etc., and further provided that a member(s) of the General Assembly could actually make the appointment(s) thereto, we declare such appointive powers to be invalid. Therefore, any person(s) so appointed may not properly serve. However, since the General Assembly has properly created the boards and commissions in these situations, the governor should fill such vacancies.

In those statutes involving boards, commissions, etc., where the General Assembly has provided for its members to serve *ex officio,* we declare that such action, while creating a proper category or classification of membership on the board or commission, also constitutes a legislative appointment thereto. Therefore, such *ex officio* "appointment" is invalid. This being true, it follows that there is no position on the board or commission to be filled.

## X. MAY THE GENERAL ASSEMBLY, IN ENACTING LAWS PERTAINING TO THE BUDGET AND THE BUDGETARY PROCESS, AUTHORIZE THE LRC TO EXERCISE CERTAIN REPORTING AND OVERSIGHT POWERS?

The next subject deals with controversial statutes relating to the budgetary enact-

ment process and with reporting an oversight following the passage of the budget.

KRS 48.040 provides that the governor, the chief justice and the LRC shall provide their budget requests on forms prescribed by the LRC. KRS 48.130 requires each branch of government, when submitting a budget request to the General Assembly, to develop and submit a plan for a reduction of that budget in the event the Commonwealth suffers a revenue shortfall in the amount of 2½% to 5% of the basic revenue estimates upon which the overall budget was premised.[22] The statute specifically provides that the plan of reduction shall be acted upon by the General Assembly. KRS 48.-130(3). If and when actual revenue shortfall develops, the reduction plan as approved by the General Assembly shall be implemented by the head of each of the submitting branches of government. KRS 48.130(4).[23] The trial court declared this statute unconstitutional because it "may" permit the LRC to veto executive decisions administering the budget and because a budget, after enactment, is purely within the purview of the executive.

KRS 48.400 provides that the Finance and Administration Cabinet shall continuously monitor the "financial situation" of the Commonwealth. It is directed to give monthly reports to the Governor, the Chief Justice, and the Legislative Research Commission. If the Cabinet determines there is a change in the estimated revenue of the Commonwealth that would require action to be taken under the contingency plans enacted by the General Assembly, then notification of such fact is to be given to "all branches of government". KRS 48.400(2). The trial court declared this statute unconstitutional for the same reasons it declared KRS 48.130 unconstitutional.

---

**22.** The statute sets up various criteria that shall "strive to protect the highest possible level of service" and further suggests that services "not essential to constitutional functions shall be subject to reduction."

**23.** The Governor, the Chief Justice of the Commonwealth and the LRC.

KRS 48.500 requires each branch of government to interpret provisions of the appropriation act in conformity with the budget memorandum adopted by the General Assembly. Such interpretation however, shall be reviewed by the Interim Joint Legislative Committee on Appropriations and Revenue. That Committee may disagree with the governmental branch's interpretation(s) and in that event, such interpretation shall *not be* implemented until it is reviewed and determined to be in compliance with that of the Interim Committee *or* until such branch of government informs the committee of its intention not to comply and proffers an explanation for its noncompliance. KRS 48.500(2), (3), (4). The trial court also held this statute unconstitutional, giving the same reasons as for the two previous statutes.

KRS 48.600 provides for the situation when revenue shortfalls exceed 5% of the estimates.[24] In such a circumstance, the Governor, the Chief Justice, and the LRC "... shall make such allotment reductions for the budget units of their respective branches of government as are deemed necessary..." KRS 48.600(1). The revisions made shall be *reported* to the Standing and Interim Appropriations and Revenue Committee. The trial court declared this statute unconstitutional, giving the same reasons as above.

KRS 48.310 requires that the budget be introduced as a *resolution,* rather than as a *bill.* It further provides that the budget should be subordinate to the Kentucky Revised Statutes and prohibits the budget from containing any language which exempts it "from the operation of a statute." The trial court also declared this act unconstitutional because the statute purported to "denigrate" the budget bill to the "level" of a joint resolution. The court reasoned that Ky. Const. Sec. 88 requires the budget to be enacted by a bill that the Governor may veto on a line-by-line basis.

The budget, which provides the revenue for the Commonwealth and which determines how that revenue shall be spent, is fundamentally a legislative matter. Ky. Const. Sec. 230 empowers the General Assembly to make appropriations; Ky. Const. Sec. 49–50 empowers the General Assembly to contract debts; and Ky. Const. Sec. 53 empowers the General Assembly to provide for investigations into the accounts of the Treasurer and Auditor of Public Accounts.[25] Certainly, we acknowledge that the Governor, as executive, *may recommend* to the General Assembly such measures as he "deems expedient" including a budget. Ky. Const. Sec. 79. However, it is equally clear that such budget is not binding on the General Assembly. Constitutionally speaking, the Governor does not have to submit such a document. Moreover, the Governor may utilize a line-by-line veto of the *appropriation* act passed by the General Assembly.[26] The General Assembly may, however, override this veto, and enact its desired appropriations. In a word, the final action on the enactment or adoption of the budget is a legislative matter. It is, of course, the duty of the Governor as the Chief Executive to carry out and to implement the budget which is passed by the General Assembly. Ky. Const. Sec. 81.

It was stated by the trial court and argued by the appellees, that the acts in question constitute an interference by the General Assembly in the purely executive function of administrating the budget. We do not agree.

---

24. See KRS 48.130.

25. See also, Section 58 (General Assembly to pay certain claims); Section 171 (General Assembly to provide for annual taxes); Section 172A (General Assembly to provide for assessment of the value of agricultural lands); Section 181 (General Assembly to provide for payment of license fees and exise tax).

26. "... The Governor shall have the power to disapprove any part or parts of appropriation bills embracing distinct items, and the part or parts disapproved shall not become a law unless recommended and passed, as in case of a bill." Ky. Const. Sec. 88.

The trial court declared KRS 48.040 to be invalid. The statute provides that the General Assembly, in exercising its constitutional prerogatives with respect to the preparation and adoption of the budget of this Commonwealth, directs its agent, the LRC, to prepare certain standardized forms upon which *all* branches of government shall make their budget requests. This statute provides for a mechanism to provide information to the General Assembly. It does not prevent any or all branches of government from providing additional information, in any form they may desire. This requirement comports with the duty of the General Assembly to approve and adopt a budget.

■ KRS 48.130 simply provides that the submitting branch of government shall provide a plan for reducing expenditures in the event of a revenue shortfall of between 2½% and 5%. The General Assembly may adopt or modify the plan. If and when such a shortfall occurs, the executive branch is directed to notify the three branches of government of that unhappy fact and the legislatively enacted reduction plan is to be implemented. No control is delegated to the LRC. Each branch of government is simply directed to carry out the reduction plan *which was enacted by the General Assembly.* As we see it, each branch of government is to do what the General Assembly has directed. Such is not a part of the administration of the budget. It is carrying out a legislative mandate. There are no constitutional infirmities here.

■ KRS 48.600 provides for the situation when a revenue shortfall is in excess (sic) of 5% of the anticipated amount. While no specific plan is required to be submitted in advance, the General Assem-

bly has declared that in the event of such shortfall each branch of government shall be the best judge of how to cope with its problems. The General Assembly, under the statute, recognizes that each branch is best equipped to make its own decisions during a revenue emergency and requires that the branch *report* its actions to the appropriate legislative committee. We find that this act comports with the separation of powers doctrine and is not an incursion into the executive duty to administer the budget of the executive branch of government.

■ KRS 48.400 directs the Executive branch to monitor the Commonwealth's financial position and to give monthly reports to each branch. When a revenue shortfall is found, the resulting notification, presumably, will cause the three branches to take the action directed and authorized by KRS 48.130 and KRS 48.600. We are at a loss to find a constitutional violation here. The executive branch is directed to be a factfinder, and to notify the affected branch of government when a shortage occurs. This statute simply provides a means whereby a branch of government is made cognizant of a shortfall and thereby may take the requisite statutory action to remedy the situation. There is no violation of an executive function here, in fact, it places the responsibility *on the executive branch,* to participate in the overall statutory scheme dealing with revenue shortfalls.

■ The trial court determined that KRS 48.500 was void because it permitted a veto of executive action in administering the budget by a legislative committee. A careful reading of the statute shows that this is not true.[27] Under the terms of the act, each branch of government is required

27. 48.500 Interpretation and legislative review of joint budget resolution. "(1) Subject to the provisions of this section, when the general assembly is not in session, all questions that arise as to the meaning of items in a joint budget resolution shall be decided by the finance and administration cabinet, by the chief justice and by the legislative research commis-

sion for their respective branches of government. (2) A decision made under subsection (1) of this section shall conform to the appropriate budget memorandum provided for by KRS 48.300. (3) The secretary of the finance and administration cabinet, the chief justice, and the legislative research commission shall

to interpret relative provisions of the appropriations act in conformity with the budget memorandum of the General Assembly. Such interpretation is to be reviewed by the Interim Joint Committee on Appropriations and Revenue. If the committee disagrees with the branch's interpretation, that branch may not implement its plan *unless* and *until:* (1) its interpretation is amended to conform to that of the committee, or (2) the branch notifies the committee of its intention not to agree with the committee and explains its view for noncompliance. When the branch complies with either of the conditions, it may proceed with its own interpretation. The decision is ultimately left up to the affected branch. While the committee may disagree or object to a contested interpretation, the bottom line is that it may not veto the decision of the affected branch. Thus, there is no legislative veto and there is no out of session action by the General Assembly or its designee, the LRC, that can effectively prevent the affected branch of government from acting on its own budget with respect to matters of interpretation.

Our constitution prohibits the exercise of the functions of one branch of government by another branch, but it also envisions some cooperation between the branches. This statute does not permit a usurpation by the legislative branch of an executive function and the degree of intrusion is so *limited* as to render it entirely reasonable and without any substantial impact.

transmit decisions made under subsection (1) of this section to the interim joint committee on appropriations and revenue of the legislative research commission and shall include, in detail, the reasons for such decision. (4) If the interim joint committee on appropriations and revenue disapproves a decision made under this section, the decision shall not be implemented unless it is: (a) Revised to comply with the objections of the committee; or (b) The committee is informed, in writing, in detail, within thirty (30) days of the committee's disapproval, that a determination has been made not to comply with the objections of the committee."

**28.** 48.310 Restrictions on joint budget resolutions. (1) A joint budget resolution shall be

KRS 48.310 gives us some pause.[28] As stated, this statute requires the budget to be introduced as a joint resolution, rather than as a bill. The statute provides that the joint budget resolution shall be "subordinate" to the Kentucky Revised Statutes and that the resolution shall not contain any language which exempts it from the operation of a statute. When the budget is enacted as a bill, the provisions thereof could repeal existing statutes. But if the budget document is introduced in the form of a resolution, it can not have the effect of repealing any existing statutes. This is one of the purposes of KRS 48.310.

Ky. Const. Sec. 88 in describing the Governor's line-by-line veto power in appropriation matters refers to the budget document as a "bill". Appellees and the trial court seize on this language and argue that a resolution "denigrates" the budget document to the "level" of a joint resolution.

We agree. Ky. Const. Sec. 88, provides the method by which *bills* shall be sent to the Governor, for either approval or disapproval (veto). It also provides how the General Assembly may override the veto. Of particular note is the provision that allows a line-by-line veto of "appropriation bills". The relevant part is as follows:

"The Governor shall have the power to disapprove any part or parts *of appropriation bills* embracing distinct items, and the part or parts disapproved shall not become a law unless reconsidered and passed, *as in case of a bill.*" (Emphasis added.)

considered as subordinate to the Kentucky Revised Statutes and temporary in nature. No provision of a joint budget resolution shall be effective beyond the second fiscal year from the date of its enactment. A joint budget resolution enacted at a special session of the general assembly shall not be effective past July 1, of the year in which the next regular session takes place. (2) No joint budget resolution shall contain language which exempts the budget resolution or any appropriation or the use thereof from the operation of a statute. Any language in a joint budget resolution in violation of this section shall be null and void.

While the Governor's veto power applies to all bills, it is only in the case of "appropriation bills" that a line-by-line veto may be exercised. The appropriation bill is the main ingredient of the budget document, and is specially singled out in Sec. 88, which deals with *bills, and bills only*. Appropriations, therefore, must be in the form of a *bill*. In addition, Ky. Const. Sec. 47, requires that all revenue matters must be introduced in the House of Representatives and such documents are referred to as "bills".

We can only conclude that KRS 48.310, which authorizes the budget to be introduced as a joint resolution, flies directly in the face of the provisions of Ky. Const. Secs. 88, 47, and is therefore, unconstitutional to that extent, we affirm the trial court, but we reverse as to other statutes previously discussed.

## XI. MAY THE GENERAL ASSEMBLY DELEGATE TO THE LRC CERTAIN AUTHORITY AND RESPONSIBILITY WITH RESPECT TO THE COMMONWEALTH'S APPLICATION FOR FEDERAL BLOCK GRANTS?

Another area of disputed statutes deals with certain duties, responsibilities and authority that the General Assembly gave to the LRC with respect to the Commonwealth's application for Federal Block Grants.

"Block grants" are allocations of sums of money from the United States Government to the various states. Although they are required to be used in nine functional areas, as a practical matter the use of these funds is largely left to the discretion of the recipient state. When the federal tax dollars are delivered to the states they become state controlled money to be spent in accordance with the state budget document. Some block grants consist of 100% federal money, while some require matching state dollars or matching state "in-kind" services. Most block grants require the expenditure of state funds for personnel, administration costs and use of state facilities.

KRS 45.351(1) provides that the various state agencies applying for block grants shall not make "continuing" application requests. Each application shall be a new one. KRS 45.3511(2) provides that *no state agency shall submit a block grant application unless it is ". . . approved by the legislative research commission as provided under KRS 45.351 to 45.359 or by the Kentucky general assembly."* (Emphasis added.) KRS 45.355 provides a system whereby the applicant state agency shall, prior to applying to the federal government for grants, submit relevant information about the grant application to the LRC. Following a review, the LRC may direct modification of the grant or may prioritize the grant application with all other state block grant applications. The LRC has the power to modify any application or to overrule the applicant agency's decision to seek the federal funds.

KRS 45.356 provides that once the LRC has determined that any grant application should be modified or not sought, it shall notify the applying agency of its decision. Once such notification is received the agency has the right to withdraw or to revise and to resubmit the grant application. The statute in Sections (2) and (3) says that the decision of the LRC as to the content of the grant application or as to whether it shall be submitted is final. KRS 48.160 reiterates that the LRC shall have approval authority over block grant applications.

The trial court declared KRS 45.3511(2), KRS 45.355, KRS 45.356(2)–(3) and the described part of KRS 48.160 to be unconstitutional. The court reasoned that the power granted to the LRC under the above statutes constituted "lawmaking" power after the General Assembly is adjourned and that it was a violation of the separation of powers; viz, that the statutes delegated to a "group of legislators" the executive power to implement and execute the state budget. We agree.

The trial court also addressed the validity of KRS 45.359(1) and (2), a purported non-

severability statute, which declares that if any section of KRS 45.351 to KRS 45.358 is declared unconstitutional, then *no block grant* money received from the United States government shall be spent or allocated unless approved by the General Assembly in regular or special sessions. The court determined that section (1) of KRS 45.359 was unconstitutional because it is an "unconstitutional condition upon the power of the Executive offices to administer the budget", and that both sections (1) and (2) of KRS 45.359 "contravene the Constitution of Kentucky and thus are void and unenforceable." We disagree.

The premise upon which the trial court decided the validity of KRS 45.3511(2), the designated portion of KRS 45.355, KRS 45.-356(2) and (3) and the described part of KRS 48.160 is that the budget and the budgetary process of the Commonwealth are purely an executive function and that these statutes permit a clear incursion by the LRC into this function, thus violating the separation of powers doctrine. The court also declared that the actions permitted by these statutes constituted "legislating" by the LRC when the General Assembly was out of session.

As we have said, in the preceding section of this opinion, the budget document, its preparation and particularly its adoption, is within the authority of the Kentucky General Assembly. This authority, this responsibility, lies solely within the province of the General Assembly. The preparation and adoption of a budget is a *legislative* matter and the General Assembly may not delegate this law making power to the LRC, and again, the General Assembly while in adjournment may not legislate through its agent, the LRC.

It is obvious that the power and authority granted to the LRC under these statutes are purely legislative in nature. The key to this conclusion lies in KRS 45.3511(2), which states:

"No state administering agency shall submit any block grant applications to a federal administrative agency *unless approved by the legislative research commission...*"

This statute allows the LRC absolute control, without criteria, standards or guidelines, over the process of seeking block grants. Literally tens of millions of dollars are involved in the federal block grant program. Once the money is received, it, in effect, becomes state money. The expenditure of money so received is an appropriation which is a function of the General Assembly.

As we have said, many of the federal grants require that matching state funds be committed as a condition of this grant. Such grants, in most cases, require the expenditure of money, allocation and use of state personnel, and the use of state facilities. Such is also the sole province of the General Assembly and cannot be delegated to the LRC. We therefore declare that the sections in question are unconstitutional and affirm the trial court.

■ We are not unaware that the General Assembly meets and legislates for limited periods of time. We are also not unaware that block grants form a substantial percentage of the Kentucky budget document. Millions of federal tax dollars come into our state, and presumably serve our people. We believe that the General Assembly may constitutionally preserve and keep secure its legislative power, in this area, and allow the LRC (or other delegatee) to monitor applications for block grants so long as the authority delegated is *not legislative.* The General Assembly may allow the LRC to act—as its agent—in matters where it has established adequate standards, guidelines, criteria, findings of fact, tests and other safeguards which will assure that the delegatee is acting within the framework of a legislative plan, and does not exercise such discretion as would constitute law making by such agency.

One further point remains. As we have said, the General Assembly in KRS 45.-

359(1) and (2) enacted a non-severability statute which was declared unconstitutional by the trial court because it imposed an invalid condition on the power of the Governor to administer the budget. Since we have established in Section X of this opinion that the responsibility for the preparation and adoption of the state budget is within the purview of the General Assembly, the premise of the trial court's opinion falls and we find no constitutional infirmity here. We accordingly reverse the trial court.

## XII. WHEN THE GENERAL ASSEMBLY GRANTS THE GOVERNOR THE POWER TO REORGANIZE CERTAIN GOVERNMENTAL AGENCIES, CAN IT GRANT THE LRC THE AUTHORITY TO VETO SUCH PLANS AS ARE PROMULGATED BY THE GOVERNOR?

Prior to the 1982 session of the General Assembly, the Governor was, with certain exceptions, empowered by statute to reorganize the executive department. KRS 12.-025. The LRC was permitted to *comment* upon those interim reorganizational actions, but the comments were only advisory, did not bind the Governor and did not have the force of law. Such executive actions, however, were subject to the approval of the General Assembly at its next session.

In 1982, by the terms of KRS 12.028(2), the reorganizational procedure was changed. Under the terms of that statute, any temporary reorganization plan must "be approved by the LRC" before it becomes effective. The intended purpose of the 1982 modification is best described by its sponsor who stated that if the Governor desires to temporarily reorganize he can:

... propose a reorganization plan by way of Executive Order to the LRC. The LRC then can put that reorganization into effect by approval of that temporary reorganization plan.

Noting the difference between the new and old acts, the sponsor commented on the Governor's power under the new act to single handedly reorganize saying, "... he [the Governor] will not be able to unilaterally do that." If the LRC does not agree with the Governor's plan, the sponsor noted that the LRC "... has the prerogative of not approving the plan."

The trial court, in declaring KRS 12.028(2) unconstitutional, reasoned that in exercising the veto so granted, the LRC would be making legislative decisions which should be made "... by the entire General Assembly." We agree.

Even though the Governor has the supreme executive power of the Commonwealth (Ky. Const. Sec. 69), he cannot transfer the functions of an existing, legislatively-created executive agency or department to another without legislative authority. *Brown v. Barkley,* Ky., 628 S.W.2d 616 (1983). We did say, in that much cited case, that the executive may have the power to transfer those functions if "... it is necessary in order for him to carry out a law or laws that the legislature has created without prescribing in sufficient detail how they are to be executed." 628 S.W.2d at 622.

However, once the General Assembly has made a determination that the power to reorganize state government in the interim periods between legislative sessions does exist, and determines that that power is in the hands of the Governor, such interim action is purely an executive function. As this Court has said: "... the transfer ... [of executive functions] ... is essentially an executive action, like the reassignment of troops or battle missions from one military command to another..." 628 S.W.2d at 622. Any authority given to the LRC to veto or substantially affect this statutorily instituted executive function is a violation of the separation of powers doctrine.

In the 1960 reorganization statute, the General Assembly, by reserving eventual approval of any reorganization to itself, recognized that ultimately reorganization is legislative in nature. In the 1982 version, the Governor is authorized to "... propose

to the general assembly, for its approval, changes in the state government..." KRS 12.028(1). As we understand it, such authority is the normal way to present any legislative suggestion to the General Assembly. Implicit in this provision is that final approval of any plan is legislative in nature.

Section (2) of the 1982 statute, KRS 12.028, authorizes an emerging type of reorganization plan to be prepared by the Governor, but such is made subject to the approval of the LRC. Since the Governor has no inherent power to reorganize and since the 1982 session again recognized that reorganization is legislative in nature, we believe that the General Assembly may not delegate such legislative power to the LRC. Having declared that there may be a need for interim reorganization and having declared that the Governor is the proper agency to undertake such action in the interim period and finally having declared that approval of such action is legislative in nature, the General Assembly cannot delegate such legislative authority to the LRC.

In accordance with the above, the judgment of the Franklin Circuit Court is affirmed in part, and reversed in part with directions that it be modified in accordance with this opinion.

All concur.