RENDERED: APRIL 18, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0198-DG

LANCE CONN; MARK DEWITT; KELVIN
ROBERSON; AND RALPH SHOLLER

APPELLANTS

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2020-CA-1495
FRANKLIN CIRCUIT COURT NO. 13-CI-01118

KENTUCKY PAROLE BOARD

APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE VANMETER**

**AFFIRMING**

In criminal sentencing, the jury establishes the maximum period a guilty defendant can be imprisoned. *See* KRS[1] 532.060 Commentary. Once that sentence is imposed and a defendant is remanded to the custody of the Department of Corrections, the Kentucky Parole Board ("Board") has sole responsibility for determining parole eligibility. *Id.* Our legislature has set forth rules the Board must follow with regard to parole decisions. Among those rules are limitations on the period the Board may defer a parole-eligible inmate's second or later parole hearing. KRS 439.340(14). These limitations contain an exception for inmates serving a life sentence. KRS 439.340(14)(b).

---

[1] Kentucky Revised Statutes.

Accordingly, the Board may defer for a lengthy period of time a subsequent parole hearing for an inmate serving life, or it may order the inmate to serve out his sentence in its entirety. Because a serve-out makes no alteration to the judicially-imposed sentence itself, the Board does not encroach upon the court's exclusive authority to set defendant's sentence and does not, therefore, violate the separation of powers set forth in Sections 27 and 28 of the Kentucky Constitution.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellants are each parole-eligible inmates serving life sentences in the Kentucky Department of Corrections who, through a majority vote of the Board, received "serve-outs," denying them any further opportunity at parole for the remainder of their sentences. *See* 501 KAR[2] 1:030(10); KRS 439.340(14)(a). While this case presents to this Court a pure issue of law, the factual bases underpinning the Appellants' crimes seems appropriate to recount since statutory terminology has changed in the decades since their convictions.

***A.   Lance Conn.***      Conn was convicted of murder and robbery first degree. Newspapers reports from the jury trial of Conn's co-conspirator, Stephen Marshall, recounted that Marshall, Conn, and Crystal Ware conspired to kill seventy-seven year-old Geneva Vaughan of Frankfort and steal silver,

---

[2] Kentucky Administrative Regulations.

coins, and jewelry from her home.[3] The Franklin Commonwealth's Attorney

initially intended to seek the death penalty for both Conn and Marshall.[4] Conn

and Ware testified against Marshall, and apparently Conn's cooperation and

testimony resulted in his receiving a life sentence for murder, KRS 532.030,

and 20 years for robbery first degree.

**B.** **_Mark DeWitt._** DeWitt was convicted of murder for shooting his

estranged wife, Frances Jo DeWitt, in the parking lot of a Jerry's restaurant in

Warren County.[5] In addition, he was convicted of one count of wanton

endangerment first degree and two counts of wanton endangerment second

degree.[6] The jury recommended, and the judge imposed, a life sentence for the

murder conviction, five years for the felony wanton endangerment charge and

twelve months each on the misdemeanor wanton endangerment counts.[7]

Although not then described as such, we recognize this as a domestic violence

---

[3] *Louisville man found guilty of murdering his great-aunt*, COURIER-JOURNAL, Jan. 28, 1996, at B5; *see also* Jennifer Scroggins, *Man convicted in great-aunt's slaying*, LEXINGTON HERALD-LEADER, Jan. 27, 1996, at C1 (Marshall's defense was that Conn and Ware were the perpetrators of the murder-robbery and that he, Marshall, was passed out in their Pewee Valley trailer). For reasons unclear, Kentucky Department of Archives and the Franklin Circuit Court Clerk have been unable to locate the record of Conn's proceedings. The murder-robbery was extensively covered in Kentucky newspapers.

[4] *Man, 21, pleads guilty in death of woman, 77*, LEXINGTON HERALD-LEADER, Aug. 22, 1995, at B3; *Short Takes, State: Death penalty to be sought in slaying*, LEXINGTON HERALD-LEADER, Mar. 17, 1995, at B3.

[5] *Dewitt sentenced to life*, PARK CITY DAILY NEWS (Bowling Green), Sept. 4, 1980, at 1.

[6] *Id.*

[7] *Id.*

crime.  Murder is a capital offense, KRS 507.020(2), and Dewitt properly was

sentenced to life.[8]

      **C.**    ***Kelvin Roberson.*** In 2004, the Court of Appeals provided the

following factual summary of Roberson's crimes, which resulted in his receiving

a life sentence:

> On November 17, 1983, an elderly Hopkinsville woman was found at home beaten into unconsciousness.  She had been raped.  Her home had been ransacked and spattered with her blood.  Two gold chain necklaces, a flashlight, and a billfold were missing.  Roberson was arrested in August 1984 and charged with crimes arising out of this incident.  A grand jury indicted Roberson on first-degree burglary, first-degree assault, first-degree rape, and theft of property valued over $100.  Venue for the jury trial was transferred to Trigg Circuit Court.  The jury convicted Roberson of burglary, rape, and theft.  Consistent with the jury's recommendation, the judgment, entered February 15, 1985, imposed a sentence of twenty years for burglary, life for rape, and five years for theft, all to run consecutively for life and twenty-five years.  Roberson appealed to the Kentucky Supreme Court, which affirmed his conviction.

*Roberson v. Commonwealth*, No. 2003-CA-002705-MR, 2004 WL 2676306, at

*1 (Ky. App. Nov. 24, 2004); *see also Hopkinsville Man Gets Life Sentence for*

*Rape, Beating*, COURIER-JOURNAL, Feb. 17, 1985, at 2.[9]  Under KRS 510.040,

---

[8] At the time of Dewitt's crime, KRS 532.035 then provided "[a] sentence for a capital offense shall be death or a sentence of life or a term of not less than twenty years.  In 1984, KRS 532.035 was repealed, and the penalty provisions were moved to KRS 532.030(1).  Act of Mar. 21, 1984, ch. 110, §§ 2-3, 1984 Ky. Acts 162.

[9] Not recounted in this case was the fact that, at the time, Roberson was out on parole for two prior convictions arising out of McCracken County, 78-CR-085, Criminal Attempt Burglary First Degree, for which he was sentenced to ten years; and 78-CR-084, Rape First Degree and Burglary Third Degree, for which he was sentenced to twenty years and one year, respectively.  Source: http://kool.corrections.ky.gov/ KOOL/Details/202767 (accessed Jan. 17, 2024); *Paducahan Pleads Guilty to Charges*, PADUCAH SUN, Nov. 20, 1978, at 23.  Roberson's Department of Corrections details also disclose that his Trigg Circuit Court convictions that resulted in his life sentence were not his only convictions following his 1982 release on parole.  He also had one indictment, 85-CR-008, in Caldwell Circuit Court for two separate sets of offenses:

rape in the first degree when the victim receives a serious physical injury is a Class A felony. Roberson was thereby properly sentenced to life. KRS 532.060(2)(a).

**D.    *Ralph Sholler.***    This Court recounted Sholler's crimes in a 1998 opinion:

> Appellant was convicted in the Kenton Circuit Court of two counts of robbery in the first degree, two counts of rape in the first degree, two counts of sodomy in the first degree, one count of burglary in the first degree, and of being a persistent felony offender in the first degree. The jury fixed his penalties at twenty years on each of the eight class B felonies, enhanced to life imprisonment on the conviction of PFO in the first degree. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).
>
> The two victims, D.B., a male, and K.B., a female, were employed at a tavern in Covington, Kentucky. After closing the tavern for the night on November 5, 1996,[10] they were accosted in the parking lot by a man wearing a camouflage jacket over a red-hooded sweatshirt and holding a "pointy" object in his hand. The man informed them that he had a .38 caliber gun and threatened to shoot them if they did not give him their money. The victims testified that they were in fear for their lives and that they gave him all of their money. In doing so, K.B. dropped some of her money on the ground. The man then ordered the victims to unlock the tavern and accompany him inside. He again threatened to kill them if they did not comply. Once inside, the man demanded the money from the cash register. The victims showed him that the cash register was empty and told him that the money was kept in a safe, which was locked. The perpetrator again threatened to kill them if they did not get the

---

May 4, 1984: Rape First Degree and Burglary First Degree, twenty years and ten years, respectively; and June 9, 1984, Rape First Degree, Burglary First Degree and Theft by Unlawful Taking, twenty years, ten years, and one year respectively. *Id.; Man Charged with Raping Elderly Woman,* STATE JOURNAL (Frankfort, Ky.), Sep. 9, 1984, at 1; *see also* Steve Breen, *Convicted Rapist Will Serve Out Life Sentence,* MESSENGER (Madisonville, Ky.), July 10, 2014, at A2 (recounting Roberson's 1983-84 sexual crime spree and 2014 parole denial/serve out).

[10] Although the opinion dates Sholler's crimes to 1996, the crimes actually occurred in 1995.

money for him.  K.B. suggested that he could take the safe with him and leave in her automobile.  The victims then carried the safe outside and placed it in the trunk of K.B.'s automobile.  To make room for the safe, a bag of groceries was removed from the trunk and placed on the ground.  The perpetrator was given the keys to the automobile.

The victims were then ordered back into the tavern and into a bathroom, where the perpetrator ordered K.B. to disrobe.  After she complied, the perpetrator ordered her out of the bathroom and onto a mat, where he subjected her to two acts of forcible rape and three acts of forcible sodomy.  Ultimately, he ejaculated on her face.  He then allowed her to obtain some paper towels, which she used both to wipe her face and to wipe the perpetrator.

*Sholler v. Commonwealth*, 969 S.W.2d 706, 707–08 (Ky. 1998).  Because Sholler was convicted of Class B felonies and PFO in the first degree, he was properly sentenced to life imprisonment.  KRS 532.080(6)(a).

Each of these Appellants was convicted of a violent crime.  While the statutory definition of "violent offender" and its concomitant sanction does not apply to DeWitt and Roberson,[11] no argument can be advanced that each of them did not participate in a violent crime.  While Dewitt's and Roberson's crimes predated the 1986 enactment of KRS 532.055, providing for separate guilt and penalty phases in felony cases, all four had the benefit of presenting such mitigating evidence as they and their counsel could present.  All properly received life sentences for their violent acts, which were imposed by judges following a proper presentence investigation.  KRS 532.050.

---

[11] The designation of someone as a "violent offender" was enacted in 1986.  Act of Apr. 9, 1986, ch. 358 § 1, 1986 Ky. Acts 786 (codified at KRS 439.3401).  DeWitt and Roberson's offenses predate the effective date of the Act.

6

In 2013, Appellants brought this action in Franklin Circuit Court challenging certain administrative regulations of the Board. Among their claims, Appellants alleged that the Board does not have the statutory authority to serve-out a life sentence and that such a practice violates the constitutional separation of powers. In an October 2020 Order, the Franklin Circuit Court concluded as a matter of law that the Board was within its statutory authority to issue a serve-out on a life sentence and granted summary judgment to the Board on this lone issue, leaving Appellants' other claims intact. Appellants appealed this issue to the Kentucky Court of Appeals, which affirmed the Franklin Circuit Court. The Court of Appeals reasoned that the legislature had not prohibited the Board from authorizing serve-outs on life sentences, and found that its own prior case, *Simmons v. Commonwealth,* 232 S.W.3d 531 (Ky. App. 2007), supported such a conclusion. This Court granted Appellants' motion for discretionary review in December 2022.

## II.     STANDARD OF REVIEW

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR[12] 56.03. This case largely involves statutory construction. As a matter of law, we review issues relative to statutory construction de novo. Thus, on appeal, we owe no deference to the construction of statutes by the trial court or Court of Appeals. *Cumberland*

---

[12] Kentucky Rules of Civil Procedure.

7

*Valley Contractors, Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644, 647 (Ky. 2007).

The primary objective in construing statutory language is determining the intent of the Legislature in enacting the legislation. To do so, "we look first to the language of the statute, giving the words their plain and ordinary meaning." *Richardson v. Louisville/Jefferson Cnty. Metro Gov't*, 260 S.W.3d 777, 779 (Ky. 2008). Statutes are to be construed as they are written, and "the intent of the Legislature must be deduced from the language it used, when it is plain and unambiguous[.]" *W. Ky. Coal Co. v. Nall & Bailey*, 228 Ky. 76, 14 S.W.2d 400, 401-02 (1929).

If the statutory language is unambiguous, extrinsic evidence of legislative intent and public policy need not be considered. *Cnty. Bd. of Educ. of Jefferson Cnty. v. Southern Pac. Co.*, 225 Ky. 621, 9 S.W.2d 984, 986 (1928). Conversely, if an ambiguity exists, we may resort to examining legislative history and public policy considerations to determine the true intent of the statute. *MPM Financial Group Inc. v. Morton, 289 S.W.3d 193, 198 (Ky. 2009).* Otherwise, statutes are to be "read … as a whole, and with other parts of the law of the Commonwealth, to ensure that our interpretation is logical in context." *Lichtenstein v. Barbanel*, 322 S.W.3d 27, 35 (Ky. 2010).

In this case, our task is properly to interpret the relevant statutes. A basic rule in statutory interpretation is that the "plain meaning" of the statute controls. *Exec. Branch Ethics Comm'n v. Stephens*, 92 S.W.3d 69, 73 (Ky.

2002). We are also required to interpret the statute in accordance with the legislative intent. *Commonwealth v. Plowman*, 86 S.W.3d 47, 49 (Ky. 2002).

## III. ANALYSIS

### A. *Parole Board Power to Grant Serve-Outs on Life Sentences.*

This case presents the Court with a singular question: whether the Board has the power to issue a serve-out to an inmate who is serving a life sentence and is parole eligible. While the current statutory scheme may not explicitly authorize the Board to grant serve-outs, the relevant legislative and administrative history persuades this Court that the legislature has condoned the Board's use of this power. For years, the Board operated under a claimed grant of broad discretionary power and issued serve-outs. Retrospectively, the legislature understood the Board was issuing serve-outs of sentences, including life sentences, despite lack of explicit authorization from the legislature to do so. This understanding is evidenced by language used in the 2011 enactment of House Bill (HB) 463.[13]

In 2011, the legislature overhauled the Commonwealth's Penal Code with the passage of HB 463. HB 463 was an effort to implement recommendations contained in a report generated by the Task Force on the Penal Code and Controlled Substances Act. The task force was created in 2010 to draft changes to the Penal Code and the Controlled Substances Act to "provide alternatives to incarceration" and to "reduc[e] recidivism while protecting and

---

[13] Act of Mar. 3, 2011, ch. 2, 2011 Ky. Acts 4.

9

enhancing public safety." LEGIS. RSCH. COMM'N, *Report of the Task Force on the Penal Code & Controlled Substances Act*, Rsch. Mem. No. 506, at 1 (2011), https://legislature.ky.gov/LRC/Publications/Research%20Memoranda/RM506.pdf (hereinafter, *Task Force Report*).

One recommendation that came out of the task force was to improve the Board's deferment process. *Id.* at 12. Deferment "means a decision by the board that an inmate shall serve a specific number of months before further parole consideration." 501 KAR 1:030(2). The task force reported,

> The Parole Board's deferment process will be improved by limiting the maximum deferment to 24 months for Class C or D nonviolent, nonsexual offenders and to 10 years for all others, except for life sentences. In addition, the task force recommends limiting the maximum deferment to 5 years unless by a vote of the full board.

*Task Force Report*, at 12–13. This recommendation was adopted by the General Assembly in Section 32 of HB 463, which amended KRS 439.340.

Beginning in 2011 with HB 463 and continuing to the present, KRS 439.340(14) limits the Board's discretion to defer subsequent parole reviews after an inmate has received his initial review. It provides,

> (14) If the parole board does not grant parole to a prisoner, the maximum deferment for a prisoner convicted of a non-violent, non-sexual Class C or Class D felony shall be twenty-four (24) months. For all other prisoners who are eligible for parole:
>
> > (a) No parole deferment greater than five (5) years shall be ordered unless approved by a majority vote of the full board.
> >
> > (b) No deferment shall exceed ten (10) years, except for life sentences.

Notably, subsection (14)(b) places no temporal limitations on the Board's discretion related to life sentences, and a plain reading of the statute leads to the conclusion that the legislature has given the Board at least enough authority to grant prolonged deferments to inmates serving life sentences—including indefinite serve-outs.

As part of HB 463, the legislature also enacted KRS 439.3403.[14] KRS 439.3403(1) requires the Board to "reconsider the parole of any prisoner as of June 8, 2011, who was given a deferment or serve-out of longer than sixty (60) months at the prisoner's most recent parole hearing," unless otherwise excluded by the statute. KRS 439.3403(2) then excludes from the reconsideration requirement any inmate whose "deferment or serve-out was approved by a majority vote of the full board" or any inmate who was convicted of a violent offense as defined in KRS 439.3401 or a sex crime as defined by

---

[14] KRS 439.3403(1-2) provides:

    (1) Except as provided in subsection (2) of this section, the board shall reconsider the parole of any prisoner as of June 8, 2011, who was given a deferment or serve-out of longer than sixty (60) months at the prisoner's most recent parole hearing.

    (2) No reconsideration shall be required under this section for any prisoner who has received a deferment or serve-out of longer than sixty (60) months if:

        (a) The deferment or serve-out was approved by a majority vote of the full board; or

        (b) The prisoner stands convicted of a criminal offense currently defined as a violent offense in KRS 439.3401 or as a sex crime in KRS 17.500, regardless of the date the crime was committed or the date of conviction.

11

KRS 17.500.[15]  The enactment of KRS 439.3403 was an effort by the legislature to confer the benefit of the newly enacted limitations on deferments on those inmates who had received lengthy deferments or serve-outs prior to the effective date of HB 463.  However, in conferring this remedial benefit the legislature did not prohibit the Board from ordering future serve-outs of life sentences.

The legislative and administrative history that provides context to this corner of the Commonwealth's parole scheme is compelling in that it tends to show the Board has never had express authority to issue serve-outs.  But even without such explicit direction from the legislature, we view the legislature's most recent forays into this area, KRS 439.340(14)(b) and KRS 439.3403, as evidence the legislature has accepted the Board's past practices.  *See Rye v. Weasel*, 934 S.W.2d 257, 262 (Ky. 1996) (holding that "[f]ailure by the U.S. Congress to repeal an administrative agency's interpretation of a congressional act is persuasive evidence that the interpretation is the one the legislature intended."); *Hughes v. UPS Supply Chain Sols., Inc.*, 677 S.W.3d 273, 280 (Ky. 2023) (holding that legislative inaction in view of administrative statutory interpretation is persuasive indication of legislature's ratification of that interpretation.

Additionally, the legislature appears to agree with our Court of Appeals with regard to the Board's serve-out power.  In *Simmons v.*

---

[15] We note that each of the Appellants stands convicted of a criminal offense currently defined as  violent in KRS 439.3401.

*Commonwealth*, 232 S.W.3d 531 (Ky. App. 2007), Simmons filed his action following the Parole Board's ordering him to serve out his two life sentences for two murder convictions. *Id.* at 533. The Court of Appeals held that because the power to grant parole is purely an executive function, "the Parole Board was within the bounds of its discretionary powers in denying parole to Simmons's [sic] and ordering him to serve out the remainder of his sentence." *Id.* at 535. The state and federal courts have consistently followed *Simmons*. *Smith v. Ky. Parole Bd.*, 2022-CA-0866-MR, 2023 WL 2052274 (Ky. App. Feb. 17, 2023); *Dunn v. Commonwealth*, 2020-CA-1430-MR, 2022 WL 2898323 (Ky. App. July 22, 2022); *Hermansen v. Bevin*, 2015-CA-1005-MR, 2016 WL 6892580 (Ky. App. Nov. 23, 2016); *Gerton v. Justice & Pub. Safety Cabinet*, 2009-CA-1712-MR, 2010 WL 2218774 (Ky. App. June 18, 2010); *Cavender v. Mudd*, 22008-CA-1988-MR, 2009 WL 2835173 (Ky. App. Sept. 4, 2009); *see also Kordenbrock v. Brown*, 469 Fed. Appx. 434 (6th Cir. 2012) (rejecting defendant's various challenges to Parole Board's life sentence serve-out, recognizing that his life "sentence is within the statutory maximum[]").

These cases, together with the statutory exception with regard to life sentences, we believe make clear that the legislature permits the Board to issue serve-outs to inmates serving a life sentence.

13

### B. The Parole Board's Serve-Out Decisions Do Not Violate Nondelegation Principles

Having determined that our legislature permits the Board to issue serve-outs, we turn to whether that grant of power nevertheless violates our separation of powers doctrine. "Perhaps no state forming a part of the national government of the United States has a Constitution whose language more emphatically separates and perpetuates what might be termed the American tripod form of government than does [the Kentucky] Constitution. . . ." *Sibert v. Garrett*, 246 S.W. 455, 457 (Ky. 1922). Our constitution is unique in that it contains "explicit provisions which, on the one hand, *mandate* separation among the three branches of government, and on the other hand, specifically *prohibit* incursion of one branch of government into the powers and functions of the others." *Legis. Rsch. Comm'n By and Through Prather v. Brown*, 664 S.W.2d 907, 912 (Ky. 1984). Taken together, those provisions, Kentucky Constitution §§ 27 and 28, have long functioned to "preclude the exercise of arbitrary power[]" by one branch of government that erroneously wields the power of another. *Commonwealth ex rel. Beshear v. Bevin*, 575 S.W.3d 673 (Ky. 2019) (quoting *Fletcher v. Commonwealth*, 163 S.W.3d 852, 863 (Ky. 2005)). This Court has been constitutionally entrusted with the judicial power, and duty, to determine when such exercises abridge the constitutional separation of powers. Ky. Const. § 109. In doing so, this Court has previously determined the separation of powers must be "strictly construed." *Brown*, 664 S.W.2d at 912 (quoting *Arnett v. Meredith*, 121 S.W.2d 36, 38 (Ky. 1938)).

14

As we and our predecessor court have recognized for over a century, parole is not a right, but a privilege to be granted or withheld within the discretion of the executive branch. *Land v. Commonwealth*, 986 S.W.2d 440, 442 (Ky. 1999); *Willard v. Ferguson*, 358 S.W.2d 516, 516 (Ky. 1962); *Morris v. Commonwealth*, 268 S.W.2d 427, 428 (Ky. 1954); *Wooden v. Goheen*, 255 S.W.2d 1000, 1003 (Ky. 1953); *Commonwealth v. Polsgrove*, 231 Ky. 750, 754, 22 S.W.2d 126, 128 (1929); *Commonwealth v. Minor*, 195 Ky. 103, 105, 241 S.W. 856, 858 (1922).

> In 1976, Chief Justice Palmore, writing for the Court, stated:

> the fundamental fact [is] that when a person has been convicted of a crime and has begun to serve his sentence the function and authority of the trial court is finished. What then happens to the prisoner is entirely in the bailiwick of the executive branch of government, and is no business of the courts, including the trial court.

*Peck v. Conder*, 540 S.W.2d 10, 12 (Ky. 1976).

Even so, only the legislature is vested by the Constitution with the power to prescribe laws for the Commonwealth, and the legislature has created and delegated its own constitutional authority over parole to the Board. Ky. Const. 29; KRS 439.320. "[A]dministrative agencies have no inherent authority and may exercise only such authority as may be legislatively conferred." *Herndon v. Herndon*, 139 S.W.3d 822, 826 (Ky. 2004) (citing *Linkous v. Darch*, 323 S.W.2d 850 (Ky. 1959); *Robertson v. Schein*, 204 S.W.2d 954 (Ky. 1947)). In administering the legislature's intent, the Board may not exceed its statutory authority. The determination of whether executive agency action and

15

regulations comport with statutory authority and legislative intent necessarily falls within this Court's judicial purview. *Brown*, 664 S.W.2d at 919.

Appellants argue that the Board oversteps its authority by ordering serve-outs because such an act "it converts a lesser sentence to a greater one, one that is beyond the lawful range that the legislature established for non-aggravated murders and Class A felonies." We disagree. In ordering a serve-out the Board simply makes a determination of parole eligibility *within* the lawfully ordered sentence set by the trial court.

Review of the sentencing process assists in showing why this is so. As explained in the 1974 Commentary to the Penal Code, KRS Chapters 500 to 534, under the pre-existing process "the jury made an initial determination as to the length of sentence. Within the limits provided by the statute which defined the crime committed, **the jury established the maximum period which an offender could be imprisoned**." KRS 532.060 Commentary (emphasis added). The jury's decision was subject to modification in two ways: the judge's statutory authority to grant probation, KRS 439.260(1), or the power of parole. *Id.* In the event a convicted offender was not granted probation, "a convicted offender was turned over to the department of corrections **for no longer than the maximum term fixed by the jury**. The power to determine the period of incarceration passed at this point to the parole board. . . . KRS 439.340 provided that the parole board had sole responsibility for determining eligibility for parole." *Id.* (emphasis added). In other words, as the Commentary explains, the Parole Board had the ability to

16

release an offender immediately upon imposition of the sentence, such that an indeterminate sentence had a maximum term fixed by the jury, but no minimum term. *Id.*

The process established by the Penal Code largely retained this process: jury sentencing to establish maximum length of incarceration, subject to reduction by either the judge or parole board. *Id.* Under the Penal Code, the judge may modify the sentence under KRS 532.070, or substitute probation or conditional discharge under KRS Chapter 533. However,

> [i]f neither of these powers is exercised or one is exercised in a way that immediately or ultimately results in imprisonment, the offender is committed to the department of corrections for the maximum term of imprisonment established by the jury. The actual length of his imprisonment is to be determined by the parole board in the same manner as was done under the pre-existing process. No minimum period of imprisonment is established in this Code for a convicted felon. This is also left to the discretion of the department of corrections, meaning that this agency can decide whether or not to have a minimum period of imprisonment for persons committed to the department following conviction of a felony.

KRS 532.060 Commentary. *See Huff v. Commonwealth*, 763 S.W.2d 106, 110 (Ky. 1988) (Leibson, J., dissenting) (quoting Penal Code Commentary to confirm that "[t]he actual length of . . . imprisonment is to be determined by the parole board[]").

This Commentary and an understanding of the history of criminal sentencing is important because it clarifies that the legislature's imposition of penalties such as life without probation or parole for twenty-five years or life without probation or parole, KRS 532.030(1), 532.080(6), are not separate

17

classes of sentence. They exist, instead, as limitations on the Parole Board's powers to impose a minimum sentence of imprisonment.

These limitations on the Parole Board's powers were the subject of the 1986 legislative session. The Board had come under increasing criticism for conducting hearings closed to the public and paroling violent criminals after very short terms of incarceration. *See* Roy Cohn, *Parole for Man Who Killed 2 People, Shot 3rd Criticized*, LEXINGTON HERALD-LEADER, Nov. 14, 1985, at B1 (the Parole Board granted parole after 7 years to Allan Todd Hume, who had been convicted of killing two people and shooting a third; the Commonwealth's Attorney had sought the death penalty); Editorial, *Two Murders, Seven Years, Why Parole System Stinks*, LEXINGTON HERALD-LEADER, Nov. 15, 1985, at A18 (noting the Parole Board's Hume decision was not isolated, as "[i]n recent years, the Parole Board has established quite a record of questionable decisions that turned convicted criminals loose after no more than minimal time in prison[]"); Editorial, *Has Parole Board Declared Open Season on Spouses*, LEXINGTON HERALD-LEADER, Jan. 26, 1985, at A8 (criticizing Parole Board for granting parole after two months of a seven-year sentence for woman convicted of manslaughter second-degree for shooting her husband three times in the back).

In *Bartley v. Wright*, 2012-SC-0643-MR, 2013 WL 1188060 (Ky. Mar. 21, 2013), this Court rejected Donald Bartley's claim to be entitled to parole, following the Parole Board's order that he serve out his life sentence. *Id.* at *1. Bartley, of course, and his co-conspirators, Roger Epperson and Benny Lee

18

Hodge are well-known to this Court due to their participation and convictions for three brutal murders, robberies, and burglaries in the mid- to late 1980s. *See, e.g., Hodge v. Commonwealth*, 610 S.W.3d 227, 228 (Ky. 2020) (setting out basic facts of the crimes, as well as the appellate proceedings). The unremarkable holding by this Court was that "parole is at most a privilege, not a right. 'Parole is a matter of legislative grace or executive clemency.' This Court has no power to order the executive branch to parole Bartley." *Bartley*, at *2 (quoting *Land*, 986 S.W.2d at 442) (internal citations omitted). A concurring opinion, however, criticized the parole process as granting the Parole Board, described as nine non-elective members, the power to convert life sentences to life sentences without parole, "in spite of the fact that neither our courts nor our [legislature] have deemed these men ineligible for parole." *Id.* (Cunningham, J., concurring).

The Appellants argue this concurring opinion supports their position. This concurring opinion misses the mark because it ignores that the Parole Board does not impose a life sentence on anyone. The life sentence was recommended by a jury and then imposed by a judge. In other words, that sentence was a judicially-imposed sentence. Following that imposition, the judicial branch has no role with respect to the sentence. *Peck*, 540 S.W.2d at 12. Further, the Parole Board cannot increase a sentence beyond that recommended by a jury; it can only lessen the period of incarceration. The Parole Board, under the processes authorized by the legislature, with respect to Bartley and these Appellants exercised its broad discretion to not lessen their

19

period of incarceration. *See Simmons,* 232 S.W.3d at 534-35 (holding that Parole Board's ordering serve out of life sentence does not enhance punishment or elongate sentence; the life sentence "has remained at a fixed term and parole eligibility is of no consequence[]").

The criticism about "non-elected" parole board members also is inapt. First, a life sentence is required to be recommended unanimously by twelve non-elected citizens. KRS 532.055. We commonly describe these twelve citizens, collectively, as a jury. Second, a life sentence is imposed by an elected official, a judge, who has considerable information about a defendant available to him or her prior to imposing that sentence. KRS 532.050. Third, we do not have to go too far back in our history, national and state, to recall instances of the abuse of pardon or commutation power allegedly based on political considerations.[16]

Beyond this, we have long recognized and approved of the legislature's grant of power to the various bodies successively tasked with making parole determinations. In *George v. Lillard,* 106 Ky. 820, 824, 51 S.W. 793, 794 (1899), the court stated,

> The parole law is not an interference with the judicial functions of the court, but is the exercise of the power of discipline which the

---

[16] Notorious Presidential Pardons (Bill Clinton's pardon of fugitive financier Marc Rich) (https://content.time.com/time/specials/packages/article/0,28804,1862257_1862321_1862324,00.html) (accessed Jan. 18, 2024); Andrew Wolfson and Joe Sonka, *Bevin Pardons include Convicted Killer Whose Brother Hosted Campaign Fundraiser for Him,* COURIER-JOURNAL, Dec. 11, 2019. In the 1970s, Tennessee saw the corruption of Governor Ray Blanton's improper influence over that State's parole board inducing it to ignore its release guidelines. Stefan J. Bing, *Reconsidering State Parole Board Membership Requirements in Light of Model Penal Code Sentencing Revisions,* 100 KY. L. J. 871, 871 (2011).

20

state possesses, to be exercised through the legislative department of the government. The legislature declares what shall constitute offenses, and prescribes the punishment, and the power to regulate the penal institutions of the state is there vested.

Our predecessor court further observed the difference between the ability to set a defendant's sentence as a judicial function and the power to parole prisoners as a strictly executive prerogative. *Morris v. Commonwealth*, 268 S.W.2d 427, 428 (Ky. 1954). In that context, the court observed,

In order for the parole system to be effective the sentence imposed by the court should be commensurate with the crime, without regard to the possibility of parole. After the sentence is imposed it is the responsibility of the executive department to determine when and if the prisoner should be released from confinement on parole.

*Id.* In short, our longstanding jurisprudence stands for the proposition that so long as the Parole Board does not alter the sentence adjudged by the court, and as long as it follows its own statutory and administrative guidelines, the Board has wide discretion in its decision to grant or deny parole.

Finally, The Board is limited in other ways that convince us it does not overstep the bounds set by the constitution. KRS 439.330 defines the duties of the Board and states in full as follows:

(1) The board shall:

(a) Study the case histories of persons eligible for parole, and deliberate on that record;

(b) Conduct reviews and hearings on the desirability of granting parole;

(c) Impose upon the parolee or conditional releasee such conditions as it sees fit;

(d) Order the granting of parole;

(e) Issue warrants for persons charged with violations of parole and postincarceration supervision and conduct

21

hearings on such charges, subject to the provisions of KRS 439.341, 532.043, and 532.400;

(f) Determine the period of supervision for parolees, which period may be subject to extension or reduction after recommendation of the cabinet is received and considered; and

(g) Grant final discharge to parolees.

(2) The board shall adopt an official seal of which the courts shall take judicial notice.

(3) The orders of the board shall not be reviewable except as to compliance with the terms of KRS 439.250 to 439.560.

(4) The board shall keep a record of its acts, an electronic record of its meetings, a written record of the votes of individual members, and the reasons for denying parole to inmates. These records shall be public records in accordance with KRS 61.870 to 61.884. The board shall notify each institution of its decisions relating to the persons who are or have been confined therein, and shall submit to the Governor a report with statistical and other data of its work at the close of each fiscal year.

KRS 439.335(1) instructs the Board to "use the results from an inmate's validated risk and needs assessment and any other scientific means for personality analysis" in deciding whether to grant parole to an inmate.

KRS 439.340 provides more details as to what information the Board should have at its disposal in making a parole determination.  It states, in part,

[T]he Department of Corrections shall obtain all pertinent information regarding each prisoner, except those not eligible for parole.  The information shall include the results of his or her most recent risk and needs assessment, his or her criminal record, his or her conduct, employment, and the reports of physical and mental examinations that have been made.  The Department of Corrections shall furnish the circumstances of his or her offense, the results of his or her most recent risk and needs assessment, and his or her previous social history to the board.

KRS 439.340(1).  Among the pertinent information before the Board would be an inmate's Pre-Sentence Investigation report which contains all of the

information that would have been placed before the judge who initially determined an inmate's sentence. Thus, the Board would be aware of any aggravating or mitigating circumstances that attach to the inmate.

KRS 439.340 continues by directing the Board to "adopt administrative regulations with respect to the eligibility of prisoners for parole, the conduct of parole and parole revocation hearings and all other matters that come before it . . . ." KRS 439.340(3)(b). It further states that

> [r]egulations governing the eligibility of prisoners for parole shall be in accordance with professionally accepted ideas of correction and reform and may utilize in part objective, performance-based criteria and risk and needs assessment information; however, nothing herein contained shall preclude the board from utilizing its present regulations in conjunction with other factors involved that would relate to the inmate's needs and the safety of the public.

*Id.*

The Board, in accordance with KRS 439.340, has adopted regulations for determining parole eligibility. 501 KAR 1:030 provides definitions and serves the primary function of explaining how to calculate when an inmate will be eligible for parole. It also explains that "[e]xcept as provided in KRS 439.340(14): (a) After the initial review for parole, a subsequent review, during confinement, shall be at the discretion of the board; and (b) The board, at the initial or a subsequent review, may order a serve-out on a sentence." 501 KAR 1:030 § 3(2). Finally, 501 KAR 1:080 incorporates by reference the Kentucky Parole Board Policies and Procedures (KYPB).

The KYPB, in turn, sets forth 16 factors the Board must assess "[b]efore recommending or denying parole[.]" KYPB 10-01(L). Those factors are:

23

(1) Current offense - seriousness, violence involved, firearm used, life taken or death occurred during commission;

(2) Prior record - prior felony convictions, prior misdemeanor convictions, history of violence, prior contact with law enforcement or criminal courts where conviction did not occur;

(3) Institutional adjustment and conduct - disciplinary reports, loss of good time, work and program involvement, particularly evidence-based program involvement;

(4) Attitude toward authority - before and during incarceration;

(5) History of Substance Abuse;

(6) History of prior probation, Pre-Trial, shock probation or parole violations;

(7) Educational history;

(8) Employment history and job skills;

(9) History of assaultive, violent behavior;

(10) Mental status - capacity and stability;

(11) Terminal illness;

(12) History of deviant behavior;

(13) Official and community attitudes toward accepting an inmate back in the county of conviction;

(14) Victim impact statement and victim impact hearing;

(15) Review of parole discharge plan - housing, employment, need for community treatment and follow-up resources; and

(16) Other factors involved that relate to public safety or the inmate's needs.

*Id.*

Within the bounds set by our statutes, inmates serving a life sentence without a parole limitation, such as Appellants, are parole eligible after serving 20 years.[17] Since the Appellants' crimes were committed in the 1980s or 1990s, they were entitled to initial parole hearings in accordance with the

---

[17] Over time, this parole eligibility has increased from 6 years to 8 years to 12 years to 20 years. *See* 501 KAR 1:030 § 3 (tracking legislative changes).

24

statutes and administrative regulations in effect at the time.[18]  The Appellants

admit they received those hearings; they were not, however, entitled to

parole.[19]  KRS 439.3401(2).  Whether Appellants are statutorily entitled to

additional parole hearings is resolved in the negative by the statutory

exceptions for life sentences we have already discussed.  The Board is given

license to make parole determinations, based upon mandatory consideration of

the documents and factors detailed above, and the Board is then permitted to

issue a serve-out of a life sentence if it sees fit.  KRS 439.340(14).  That serve-

out does not lengthen the sentence or violate the statutory minimum time an

---

[18] As required by the statutory authority in effect at the time, Conn received his first parole hearing at 12 years, which resulted in a 96 month deferral; DeWitt at 6 years, with successive deferrals, 48 months, 48 months, 144 months and 96 months; Roberson at 7 years, with successive deferrals, 144 months and 120 months; and Sholler at 12 years.

[19] Because the Appellants were not juveniles when they committed their crimes and not entitled to parole, citation to *Graham v. Florida*, 560 U.S. 48 (2010), is not only misplaced but irrelevant.  In *Graham*, the Court held that Florida, which otherwise had no parole system, could not constitutionally impose a life sentence without parole on a juvenile for a non-homicide crime.  *Id.* at 74.  Rooted in its Eighth Amendment jurisprudence prohibiting cruel and unusual punishments, the Court held that such a juvenile offender was entitled to a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  *Id.* at 75.  Clearly, that rule of constitutional law has no applicability to these Appellants, all of whom were adults at the time of their crimes, and two of whom were convicted of murder.

Similarly, *Phon v. Commonwealth*, 545 S.W.3d 284 (Ky. 2018) does not compel the result the Appellants seek.  Phon was charged with and tried for two murders, assault first degree, robbery first degree, burglary first degree, all committed when he was a juvenile, and the prosecutor sought the death penalty.  Phon was found guilty and the jury was instructed on death, life without parole, life without parole for 25 years, life, and a term of 20 or more years.  The jury recommended, and the trial court imposed, life without parole.  Our 2018 decision held that Phon's constitutional arguments, *i.e.*, life without parole was an impermissible penalty for a juvenile, failed, *id.* at 293-94, but that our legislature limited the maximum period without parole at 25 years for juvenile offenders.  *Id.* at 300-03 (citing KRS 640.040).  Whether Phon might be entitled to parole and the Parole Board's powers in that instance were not issues.

inmate must serve; rather, the Board has merely made a determination of where Appellants will be required to serve their sentence, or, to put it redundantly, whether they will be paroled.

### C. *The Parole Board Process and Decisions Do Not Violate Kentucky Constitution Section 2.*

Finally, the Appellants criticize that Stephen Marshall, Conn's partner in the murder of Geneva Vaughan, originally sentenced to life without parole for 25 years, had his initial parole hearing in 2019 and was not given a serve out, but rather deferred for 120 months, *i.e.*, 10 years. The Appellants also point out the claimed disparate treatment of Kevin Murtaugh, "an ideal candidate for parole," who was given a serve out,[20] and Claude Plummer, given a deferment despite a significant criminal history and higher risk level to offend.[21] The Appellants claim these examples confirm that the Parole Board's decisions are arbitrary, in violation of Kentucky Constitution Section 2. We disagree.

---

[20] Murtaugh, in fact, served out. He died in prison in August 2019. Terry DeMio, *'Torso Nurse' Killer Dies in Prison, Freeing Younger Sister from Years of Terror*, CINCINNATI ENQUIRER, Aug. 19, 2019. (source: https://www.cincinnati.com/story /news/2019/08/19/strangulation-dismemberment-murderer-dubbed-torso-nurse-killer-dies-in-kentucky-prison/2049103001/) (accessed Jan. 22, 2024). As recounted in this Court's opinion affirming Murtaugh's life sentence, Murtaugh strangled his wife, Diane, with a rope and then dismembered her body with a chain saw. *Murtaugh v. Commonwealth*, 579 S.W.2d 619, 620 (Ky. 1979). Again, like Dewitt's crime, we would consider this gruesome crime a violent crime involving domestic violence.

[21] According to Plummer's Department of Corrections Details, he was convicted of three murders in 1978 for which he received 99 years each, and another murder in 1982, for which he received 20 years. He seems to have appeared before the Board several times and has been given the maximum deferment each time, most recently in 2015, at which time he was deferred for 120 months. Plummer certainly received long sentences, albeit not life. The apparent reason he has not been given a serve-out is that sentences with a term of years may not be given a deferment longer than ten years. KRS 439.340(14)(b).

26

A few points on this argument. As initial matter, Conn and Marshall, both with life sentences, had different parole eligibility dates: Conn was eligible after 12 years; Marshall after 25. As of this date, each remains incarcerated and has not been granted parole. Thus, they are being treated alike. Plummer likewise remains incarcerated, although Murtaugh died in prison in 2019. This indicates all four have been treated the same. To the extent they can be said to being treated differently, that merely proves that the criminal justice system, unfortunately, as with all human endeavors, does not always treat similarly situated individuals alike. It does not mean that the system is arbitrary and violates Section 2. *See St. Clair v. Commonwealth*, 451 S.W.3d 597, 658 (Ky. 2014) (rejecting claim that death penalty was disproportionate because others who committed worse crimes were not given death since "the Constitution mandates that capital sentencing be individualized, with a focus on the defendant and his crime. That other defendants who have committed other crimes received different sentences does not mean St. Clair's sentence violates the Constitution[]"); *see Oyler v. Boles*, 368 U.S. 448, 456 (1962) (holding that the "conscious exercise of some selectivity in enforcement [of habitual violator statute] is not in itself a federal constitutional violation . . . unless based upon an unjustifiable standard such as race, religion, or other arbitrary classification[]"). The same rationale would appear applicable to parole decisions by the Parole Board. *Stewart v. Commonwealth*, 153 S.W.3d 789, 795 (Ky. 2005) (parole "is considered on a case-by-case basis[]").

## IV. CONCLUSION

In sum, each of the Appellants was duly convicted and sentenced to life imprisonment by a trial court. Our legislature has created clear exceptions regarding deferral limitations for inmates serving life sentences, and those exceptions allow the Board to order a serve-out to those inmates. This power does not encroach upon the judiciary's sentencing prerogatives, nor can we discern any other Constitutional infirmity present in the exercise of that power. A serve-out, then, is authorized by the legislature and not constitutionally impermissible. Appellants are each properly subject to the imposition of a serve-out by virtue of their sentence.

To the extent Appellants raise concerns regarding the wisdom of such a power, we can do no better than to turn to the words of our predecessor court:

> [T]he problem of prison reform has engaged the profound consideration of legislatures, congresses, and humanitarians generally, covering a period of many years, resulting in investigation and the securing of facts and statistics for the enactment into laws of such reforms as appear to be needed for the moral uplift of those convicted of crime; and the acts before us but embody, in some measure, in their terms, the crystallized thought of the best minds upon this subject of absorbing interest.
>
> We do not mean to say that the act in its present form is perfect, for it is not, but its defects will doubtless be remedied by further legislation, and it is not in our opinion justly open to the criticisms made upon it[.]

*Wilson v. Commonwealth*, 141 Ky. 341, 352-53, 132 S.W. 557, 562 (1910). Whatever concerns Appellants may have with parole guidelines are more properly the province of the legislature to resolve and Appellants should direct their efforts to that body. Or, to the Governor who can exercise his

28

constitutional power to commute sentences or grant reprieves and pardons. KY. CONST. § 77.

For the foregoing reasons, we affirm the Franklin Circuit Court's judgment as affirmed by the Court of Appeals.

All sitting. Bisig, Conley, Lambert, and Nickell, JJ., concur. Keller, J., concurs in result only by separate opinion in which Thompson, J., joins.

KELLER, J., CONCURRING IN RESULT ONLY: A life without parole sentence "deprives the convict of the most basic liberties without giving hope of restoration." *Graham v. Florida*, 560 U.S. 48, 69–70 (2010). "[I]t means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." *Id.* at 70 (quoting *Naovarath v. State*, 779 P.2d 944 (Nev. 1989)). Through the imposition of this sentence, "the State makes an irrevocable judgment about that person's value and place in society." *Id.* at 74.

A "serve-out" of a life sentence by the Kentucky Parole Board (the Board) has the same effect on an inmate as does a sentence of life in prison without parole. It "gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope." *Id.* at 79.

Although I agree with the Majority's ultimate disposition in this case, I concur in result only and write separately to emphasize the significant interests at stake in every parole decision, but especially in those which serve out a life

sentence. I also write to express my concerns with the parole process itself and the lack of checks on the significant power wielded by the Board.

A decision to serve out a life sentence virtually guarantees that an inmate will never have the opportunity to exercise his fundamental right of liberty ever again. This decision "alters the offender's life by a forfeiture that is irrevocable." *Id.* at 69. It takes all hope away from an inmate and quashes any incentive he may have to better himself, to behave well, or to contribute to the community in any meaningful way. It provides "no chance for reconciliation with society" or for meaningful contrition or forgiveness. *Id.* at 79.

The significance of the Board's decision to eliminate any opportunity an inmate has at parole cannot be understated. This decision is so significant, in fact, that the legislature has sought to afford heightened due process protections to criminal defendants before even the judicial branch can restrict their opportunity at parole. Statutes mandate that a defendant cannot be sentenced to life without parole, or even life without parole for twenty-five (25) years, unless the judicial factfinder finds **beyond a reasonable doubt** that at least one statutory aggravating circumstance has been proven. KRS 532.025(3). Further, that factfinder is also **required** to consider a statutory list of mitigating factors, as well as any other mitigating circumstances permitted by law, in determining whether to sentence the defendant to an enhanced penalty. KRS 532.025(2). All of these factors—both aggravating and mitigating—are the same factors that must be considered in sentencing a defendant to **death**. *Id.* In this way, the gravity of imposing a sentence that

30

deprives a defendant of the possibility of parole, is equated to the gravity of imposing a death sentence.

Aside from the personal interest at stake for an inmate who is given a serve-out of a life sentence, there are also significant penological interests at stake. An inmate who has no hope of ever being released from prison has no incentive to behave well while incarcerated. The possibility of parole and the accompanying knowledge that the Board will consider their institutional behavioral record provides inmates with a reason to follow the rules of the institution at which they are incarcerated. It provides wardens with a certain amount of control over the populations of their institutions which will dissipate when inmates no longer have any possibility of parole.

The serve-out of life sentences also results in increased corrections costs, as the system must bear the burden of housing an aging inmate population. Research has shown that prisoners often lack access to appropriate health care treatment prior to incarceration and often enter prison suffering from inadequately treated chronic conditions and other illnesses. Benjamin Fleury-Steiner, *Effects of Life Imprisonment and the Crisis of Prisoner Health*, 14 Criminology & Pub. Pol'y 407, 410 (2015).  As prisoners grow older, they often develop new acute or chronic conditions that require comprehensive health care. *Id.* In fact, "[a] robust body of research shows that incarceration itself accelerates aging: people face more chronic and life-threatening illnesses earlier than we would expect outside of prison, and physiological signs of aging occur in people younger than expected." Emily Widra, *The aging prison*

31

*population: Causes, costs, and consequences*, Prison Policy Initiative (Aug. 2, 2023), https://www.prisonpolicy.org/blog/2023/08/02/aging/. The result of this in Kentucky is that the Kentucky State Reformatory maintains a 75-bed Nursing Care Facility and a 50-bed Daily Assisted Living Unit. *Kentucky State Reformatory*, https://corrections.ky.gov/Facilities/AI/ksr/Pages/default.aspx (last visited Mar. 26, 2024). The cost of housing an aging inmate population is an additional significant state interest that is at stake in prolonged prison terms.

Given the extraordinarily important interests at stake in every Board decision to serve out an inmate with a life sentence, I find it important to take a critical look at the parole process itself which leads to these decisions. The General Assembly has enacted statutes that require Board members to have a plethora of information at their disposal when they make their parole decisions. Kentucky Revised Statute (KRS) 439.335(1) instructs the Board to "use the results from an inmate's validated risk and needs assessment and any other scientific means for personality analysis" in deciding whether to grant parole to an inmate. KRS 439.340 provides more details as to what information the Board should have available to it when making a parole determination. It says,

> [T]he Department of Corrections shall obtain all pertinent information regarding each prisoner, except those not eligible for parole. The information shall include the results of his or her most recent risk and needs assessment, his or her criminal record, his or her conduct, employment, and the reports of physical and mental examinations that have been made. The Department of Corrections shall furnish the circumstances of his or her offense,

the results of his or her most recent risk and needs assessment, and his or her previous social history to the board.

KRS 439.340(1). The statute further provides that the Board "shall consider the pertinent information regarding the prisoner, including the results of his or her most recent risk and needs assessment, and shall have him or her appear before it for interview and hearing." KRS 439.340(2). Finally, it directs that "parole shall be ordered only for the best interest of society . . . ." *Id.*

Finally, the Kentucky Parole Board Policies and Procedures (KYPB) 10-01 governs the conduct of "parole release hearings." Subsection K of this regulation requires that the Board staff review "[o]ffender files and materials related to the offender's case" before the hearing. In turn, Board members are required to "review the results of the risk and needs assessment prepared by the Board's staff or by the Department of Corrections pursuant to KRS 439.335 and 439.340(1) before the hearing for the offender." KYPB 10-01(K)(1). Further, the Board members should also have access to the Kentucky Offender Management System ("KOMS") during the hearing. *Id.*

Despite the host of information about the inmate that is gathered by the Department of Corrections and made available to the Board in making its decision, little direction is given to the Board regarding the factors to be considered when deliberating on the serve-out of a life sentence and none is given on how to weigh those factors.

The statutes provided by the General Assembly to guide the Board's work include few requirements. The statutes' only express mandates to the Board in making a parole decision are to consider all "pertinent information" about the

33

inmate, including a risk and needs assessment, and to grant parole only "for the best interest of society." KRS 439.340(2). KRS 439.335(1) instructs the Board to "use the results from an inmate's validated risk and needs assessment and any other scientific means for personality analysis" in deciding whether to grant parole to an inmate. KRS 439.340 places a duty on the Department of Corrections to provide certain information to the Board, but does not place a similar duty on the Board members to consider that information, nor does it instruct the Board on the weight to be given each piece of information. It merely says that the Board "shall consider the pertinent information regarding the prisoner, including the results of his or her most recent risk and needs assessment, and shall have him or her appear before it for interview and hearing." KRS 439.340(2). It does not require that the Board consider the inmate's Pre-Sentence Investigation report, as the Majority seems to indicate, however it does further direct that "parole shall be ordered only for the best interest of society . . . ." *Id.*

Finally, KRS 439.340(3)(b) directs the Board to "adopt administrative regulations with respect to the eligibility of prisoners for parole, the conduct of parole and parole revocation hearings and all other matters that come before it . . . ." It further states that

> [r]egulations governing the eligibility of prisoners for parole shall be in accordance with professionally accepted ideas of correction and reform and may utilize in part objective, performance-based criteria and risk and needs assessment information; however, nothing herein contained shall preclude the board from utilizing its present regulations in conjunction with other factors involved that would relate to the inmate's needs and the safety of the public.

34

*Id.*

Following the legislature's direction, the Board promulgated administrative regulations to govern its work. However, the Board's self-promulgated regulations, like the legislature's statutes in KRS Chapter 439, provide no guidance as to when a serve-out of a life sentence is appropriate or what information the Board should consider in making that life-altering decision.

501 KAR 1:030 governs the determination of parole eligibility. As the Majority explains, this regulation provides definitions and serves the primary function of explaining how to calculate when an inmate will be eligible for parole. It also states that "[e]xcept as provided in KRS 439.340(14): (a) After the initial review for parole, a subsequent review, during confinement, shall be at the discretion of the board; and (b) The board, at the initial or a subsequent review, may order a serve-out on a sentence." 501 KAR 1:030 Section 3(2). The regulations themselves provide no other guidance to the Board regarding factors to consider when determining whether to grant or deny parole or to serve-out a sentence. Finally, 501 KAR 1:080 incorporates by reference the Kentucky Parole Board Policies and Procedures (KYPB).

KYPB 10-01(L) requires the Board to "apply one (1) or more of the following factors to an inmate" "[b]efore recommending or denying parole":

(1) Current offense - seriousness, violence involved, firearm used, life taken or death occurred during commission;

(2) Prior record - prior felony convictions, prior misdemeanor convictions, history of violence, prior contact with law enforcement or criminal courts where conviction did not occur;

(3) Institutional adjustment and conduct - disciplinary reports, loss of good time, work and program involvement, particularly evidence-based program involvement;

(4) Attitude toward authority - before and during incarceration;

(5) History of Substance Abuse;

(6) History of prior probation, Pre-Trial, shock probation or parole violations;

(7) Educational history;

(8) Employment history and job skills;

(9) History of assaultive, violent behavior;

(10) Mental status - capacity and stability;

(11) Terminal illness;

(12) History of deviant behavior;

(13) Official and community attitudes toward accepting an inmate back in the county of conviction;

(14) Victim impact statement and victim impact hearing;

(15) Review of parole discharge plan - housing, employment, need for community treatment and follow-up resources; and

(16) Other factors involved that relate to public safety or the inmate's needs.

The Majority posits that the Board "must assess" all 16 of these factors, but the plain language of the policy only requires application of **one** of the listed factors. Accordingly, an inmate could be forever denied any hope of life outside the prison walls based on a finding of only one of the listed considerations and after only a review of a risk and needs assessment. His life could forever be altered in a nearly irrevocable way based solely on, for example, his lack of

36

employment history, or lack of education, or drug use which could date back decades. He could even be denied any further opportunity at parole based solely on the seriousness of his offense, which, I must emphasize, was already taken into consideration when the judicial branch chose to sentence him to life in prison while still allowing the possibility of parole.

To summarize, Board members have access to an abundance of information about an inmate but are provided no guidance on how to weigh that information in making their parole decisions. Further, even if Board members wanted to review all of the information provided to them and carefully weigh it, they likely would not have enough time to do so, given their burdensome workload.

While this case was pending in the trial court, Lelia VanHoose, chair of the Board, was deposed. In her deposition, VanHoose testified that, on average, each Board member must make approximately 85 decisions, including both parole release and parole revocation decisions, in a week. Because approximately 9.5 hours of the Board's 37.5-hour work week is devoted to the full Board meeting and victim hearings, only about 28 hours remain in the week to make those 85 decisions. When this time is averaged out, Board members can spend, on average, only about 20 to 25 minutes on each decision. VanHoose testified that this time estimate was "plausible," based on her experience on the Board. It seems to this writer that it would be nearly impossible for Board members, though through no fault of their own, to wade through all of the information available to them in any given case in a mere 20

37

to 25 minutes. Thus, some information is inevitably going to be overlooked. This is especially concerning in any decision to serve out a life sentence, given the incredibly high interests at stake in those decisions.

The Board wields significant power over the life and future of Kentucky inmates, and as previously described, has been provided neither sufficient guidance by the General Assembly on how to appropriately use that power nor sufficient time to undertake an in-depth review of the cases before it. I further discern little to no meaningful external checks on the Board's unfettered discretion to grant serve-outs of life sentences; in fact, it seems the legislature has insulated the Board's discretion from external review.

KRS 439.330(3) explicitly states that orders of the Board shall not be subject to judicial review except as to ensure their compliance with the statutory requirements of KRS Chapter 439. Because KRS 439.340(14)(b) fails to place any *statutory* limits on the Board's discretion to grant serve-outs of life sentences, the legislature, through KRS 439.330(3), has foreclosed any opportunity for judicial review of the Board's exercise of its discretion, except for constitutional challenges. Such a reality leaves little other recourse to inmates to challenge the Board's decisions.

Perhaps in response to KRS 439.330(3), the Board has taken it upon itself to promulgate policies and procedures governing the internal "reconsideration" of Board decisions. KYPB 10-00. This process, however, leaves much to be desired. Per KYPB 10-00(F)(3), any request for

38

reconsideration review of the Board's decision to grant a serve-out of a life sentence shall only be granted "at the discretion of the Board," and:

(a) If there is an allegation of misconduct by a Board member that is substantiated by the record;

(b) If there is a significant procedural error by a Board member; or

(c) If there is significant new evidence that was not available when the hearing was conducted. A request based on the availability of new evidence or information shall be accompanied by adequate documentation.

Even if, upon the receipt of such a request, the Board Chairperson or a designee does wish to exercise that discretion and reconsider the Board's decision to serve-out a life sentence, a **majority** of the Board must vote in favor of granting reconsideration. KYPB 10-00(G). It is not lost on me that the same **majority** vote of the Board was also required to order the underlying serve-out at issue. KRS 439.340(14)(a). As such, it is clear that the Board's internal policies lack any compulsory review processes to check against the Board's unfettered discretion to grant serve-outs of life sentences.

Further, the legislature has also ensured that the nine unelected members of the Board cannot be easily removed for abusing their discretion. KRS 439.320(5) stipulates that "[t]he Governor may not remove any member of the board except for disability, inefficiency, neglect of duty, or malfeasance in office. . . ." Although the Majority seeks to defend against any criticism of the Board based on the fact that its members are unelected, this is an important factor to consider because its consequence is that the members of the Board are not subject to being ousted from their positions by a vote of the citizens of

39

this Commonwealth. Their lack of accountability to the voters, and even to the Governor who appointed them, is further evidence that their power is inadequately harnessed.

The Majority seems to equate the unelected nature of the members of the Board with the unelected nature of the members of the jury who recommend a life sentence. However, the two are starkly different. A jury's recommendation only comes after twelve jurors have deliberated, for as much time as they need, and agreed unanimously that a life sentence is appropriate. It also comes after being instructed on the law by the trial court and the presentation of all relevant and admissible evidence by both the prosecution and defense. The jury's recommendation is still subject to the trial court's ability to reduce the sentence, *Dotson v. Commonwealth,* 740 S.W.2d 930, 931 (Ky. 1987), either to comply with the law or with concepts of fundamental fairness. The sentence is then subject to further review by this Court and potentially even the United States Supreme Court. Abundant safeguards are in place to reign in an unlawful or fundamentally unfair jury sentencing recommendation. Such is not the case for Board decisions.

To me, it seems the only other mechanism an inmate has for relief from the Board's decision to serve out his life sentence is gubernatorial clemency. KY. CONST. 77. This form of relief is appropriately used only sparingly and cannot function as an adequate safeguard against the Board's actions.

When taken together—the limited guidance provided to members of the Board in making parole decisions, the inadequate time to review all relevant

information, and the lack of external checks on the Board's decisions—raise significant concerns, in this writer's mind, about arbitrary decision-making. "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." KY. CONST. § 2. When an administrative agency wields unfettered, unnecessary, and uncontrolled discretion, the opportunity for absolute and arbitrary exercises of power swells, sometimes reaching intolerable levels. The Appellants have alleged facts in the circuit court that may provide evidence of an arbitrary use of the Board's power, but the circuit court has not made any factual findings regarding these allegations, and this Court is not a fact finder. As such, I believe the Majority improperly addresses this issue, because it is not before us today. However, I remain mindful that our Constitution protects "against unnecessary and uncontrolled discretionary power." *Commonwealth ex rel. Beshear v. Bevin*, 575 S.W.3d 673, 683 (Ky. 2019) (quoting *Miller v. Covington Dev. Auth.*, 539 S.W.2d 1, 5 n.9 (Ky. 1976)). Such protection is of the utmost importance when the decision being made is one that is arguably counter-intuitive to the notion of rehabilitation and irrevocably takes away a person's hope to ever leave prison.

Finally, this separate opinion should in no way be viewed as a criticism of any particular Board, past or present, or any particular Board member, past or present, or even any particular Board decision. In general, I believe that each Board member does the best he or she can, with the limited guidance provided to him or her and the vastly inadequate time within which he or she

41

must make these life-altering decisions. However, given the gravity of the interests at stake, I must express my concern that the parole process itself, along with the lack of checks on the power of the Board, could result in said power being wielded in a manner inconsistent with our constitution.

Thompson, J., joins.

COUNSEL FOR APPELLANTS:

Timothy G. Arnold
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Angela Turner Dunham
Amy Virginia Barker
Leah Cooper Boggs
Seth Edward Fawns
Kentucky Justice & Public Safety Cabinet

COUNSEL FOR AMICUS, ATTORNEY GENERAL OF KENTUCKY:

Russell M. Coleman
Attorney General of Kentucky

Matthew Franklin Kuhn
Solicitor General